The **STATE OF ALASKA, ex rel.; YUKON FLATS SCHOOL DISTRICT; Unalakleet/Neeser Construction JV; Unalakleet Native Corporation; Neeser Construction Company; and Gerald Neeser, Plaintiffs–Appellees,**

v.

**NATIVE VILLAGE OF VENETIE; Venetie Native Council; the Venetie Tax Court; the Venetie Tax Commission; Gideon James; Lawrence Roberts; Larry Williams; Ernest Erick; Lincoln Tritt; John Titus; and David Case, Defendants–Appellants.**

**No. 87–4333.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted June 7, 1988.

Decided Sept. 9, 1988.

---

Robert T. Anderson, Anchorage, Alaska, for defendants-appellants.

Douglas K. Mertz, Jack McGee and William F. Cummings, Asst. Attys. Gen., Juneau, Alaska, for plaintiffs-appellees.

James R. Atwood, Dwight C. Smith, III, Covington & Burling, Wash., D.C., Williams B. Rozell and Richard B. Brown, Faulkner, Banfield, Doogan & Holmes, Juneau, Alaska, for amici curiae.

Before WRIGHT, FERGUSON and BRUNETTI, Circuit Judges.

BRUNETTI, Circuit Judge:

## I

The Village of Venetie ("Venetie") and Arctic Village are communities located in north-central Alaska, primarily inhabited by Native Alaskans. In 1940, Venetie reorganized under the Indian Reorganization Act of 1934 ("IRA"), ch. 576, 48 Stat. 984 (codified as amended at 25 U.S.C. § 461 et seq.), forming both a constitutional governing body and a corporate body. Arctic Village did not reorganize.

In 1943, the Secretary of the Interior created a reservation out of approximately 1.8 million acres of land surrounding these villages. Congress revoked the reservation in 1971 by enacting § 19(a) of the Alaska Native Claims Settlement Act ("ANCSA"), Pub.L. No. 92–203, 85 Stat. 688, 710 (1971) (codified at 43 U.S.C. § 1618(a)). However, pursuant to § 19(b) of ANCSA, 43 U.S.C. § 1618(b), each village incorporated and acquired fee simple title to a portion of the former reservation land. Then, in 1978, the villages transferred title to the land to a joint governing body known as the Native Village of Venetie Tribal Government ("Native Village").

In 1978, Native Village adopted a five percent gross receipts tax on businesses operating upon its land. Due to the lack of commercial activity in the area, there was no opportunity to enforce the ordinance. This changed in 1986 when the State of Alaska ("State"), through one of its regional school districts, decided to construct an addition to the public high school in Venetie. While the State was soliciting bids from contractors, Native Village announced that it would impose the gross receipts tax on the contractor ultimately selected for the construction project.

The contract was awarded in February 1986, and construction commenced that summer. During that same period, Native Village replaced its gross receipts tax ordinance with a business activity tax ordinance. The new tax was levied in Decem-ber, at which time the contractor was notified that it had incurred a liability of approximately $160,000. Neither the contractor nor the State paid the tax.

After Native Village had unsuccessfully attempted to collect the tax, the State informed Native Village that, as the real party in interest, it would challenge the tax in federal court. Native Village then filed a complaint in the Venetie Tax Court ("Native Court") against the State, the school district and the contractor ("appellees"). Rather than answer the complaint, appellees brought an action in the District of Alaska for declaratory and injunctive relief against Native Village, Venetie, the Native Court, and others ("appellants"). Appellees claimed that neither Native Village nor Venetie is an Indian tribe empowered to exercise tribal sovereignty, that neither entity exists on an Indian reservation, and therefore, that neither entity has jurisdiction to impose a tax on non-members. Appellants responded with a motion to dismiss, arguing that they are immune from suit by virtue of their tribal status, and that appellees have failed to exhaust tribal remedies.

On October 30, 1987, the district court reserved decision on the motion to dismiss. It did, however, decide preliminarily to enjoin appellants from further enforcement proceedings. On appeal, appellants challenge the merits of the preliminary injunction ruling, and also renew the substance of their motion to dismiss (which is still pending before the district court).

A district court's decision to grant a preliminary injunction should be reversed "only when the district court abused its discretion or based its decision on an erroneous legal standard or on clearly erroneous findings of fact." *Colorado River Indian Tribes v. Town of Parker*, 776 F.2d 846, 849 (9th Cir.1985).

## II

Appellants first argue that the status of either Native Village or Venetie as an Indian tribe provides them with sovereign immunity, thereby depriving the district court

of jurisdiction to entertain this action, even to the extent of granting a preliminary injunction.

■ Appellants accurately recognize that sovereign immunity is an incident of sovereign power, and that the sovereign power of an Indian community depends on its tribal status, *see Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 55–59, 98 S.Ct. 1670, 1675–77, 56 L.Ed.2d 106 (1978); *Bottomly v. Passamaquoddy Tribe*, 599 F.2d 1061, 1062–63 (1st Cir.1979). Their argument in favor of sovereign immunity assumes that either Native Village or Venetie has attained tribal status. However, appellees vigorously contest that issue. Thus, before we can conclude as to appellants' immunity from this action, we must determine whether Native Village or Venetie is a tribe for legal purposes.

Contrary to appellants' contention, this court's decision in *Price v. State of Hawaii*, 764 F.2d 623 (9th Cir.1985), *cert. denied*, 474 U.S. 1055, 106 S.Ct. 793, 88 L.Ed.2d 771 (1986), did not hold that organization under the IRA is conclusive evidence of tribal status. In *Price*, the court merely stated that tribal status would be arguable in the event of IRA organization. *Id.* at 626. Also, amici have noted that the language of the IRA's Alaska amendment, 25 U.S.C. § 473a, raises doubt as to whether IRA organization should be construed so conclusively in the case of Alaskan Natives. Furthermore, much uncertainty exists concerning the structure of Native Village, Venetie, and Arctic Village that may have an impact on the IRA analysis.

■ If the IRA does not settle the matter, the inquiry would shift to whether Native Village or Venetie has been otherwise recognized as a tribe by the federal government. *See, e.g., Price*, 764 F.2d at 626–28. Failing there, tribal status may still be based on conclusions drawn from careful scrutiny of various historical factors. *See, e.g., Mashpee Tribe v. New Seabury Corp.*, 592 F.2d 575, 582–88 (1st Cir.), *cert. denied*, 444 U.S. 866, 100 S.Ct. 138, 62 L.Ed.2d 90 (1979).

■ Once tribal status is determined, other considerations arise. The sovereign immunity that naturally flows from tribal sovereignty will not be effective if it has been divested by Congress or otherwise lost by implication. *See United States v. Wheeler*, 435 U.S. 313, 322–26, 98 S.Ct. 1079, 1085–87, 55 L.Ed.2d 303 (1978); *Bottomly*, 599 F.2d at 1066. Nor will it be effective if it was waived during incorporation under the IRA. *See* W. Canby, *American Indian Law* 74–75 (1981). And even if the tribe and its instrumentalities are immune, the individual officers of the tribe will not be immune unless they were "acting in their representative capacity and within the scope of their authority." *Hardin v. White Mountain Apache Tribe*, 779 F.2d 476, 479 (9th Cir.1985).

The district court recognized the complexity of the sovereign immunity question, and accordingly withheld its ruling pending "more study and a more carefully drawn decision." We will not attempt to decide this issue in the first instance, especially given the incomplete record that now exists. Appellants maintain that it would be a tremendous waste of judicial resources if this panel defers to the district court and the district court incorrectly concludes that there is no sovereign immunity. This is because the district court's decision would not be an appealable interlocutory order. We disagree. Rather than a waste, we believe that in this case it would be a necessary investment of judicial resources to develop a record and allow the district court to reach a decision as to its own jurisdiction.

■ The pendency of appellants' claim of sovereign immunity does not itself represent a bar to the district court's ability to impose a preliminary injunction. The district court was intent upon preserving the status quo in the face of appellants' motion to dismiss and the difficult question raised by the merits of the action. The Supreme Court has stated, in *United States v. United Mine Workers of America*, 330 U.S. 258, 293, 67 S.Ct. 677, 695, 91 L.Ed. 884 (1947), that the district court "had the power to preserve existing conditions while it

was determining its own authority to grant injunctive relief." *See also* 13 C. Wright, A. Miller, & E. Cooper, *Federal Practice and Procedure* § 3537 at 334 (1975). The Fifth (and later the Eleventh) Circuit has consistently echoed *United Mine Workers*. *See Fernandez–Roque v. Smith*, 671 F.2d 426, 431 (11th Cir.1982); *Stewart v. Dunn*, 363 F.2d 591, 598 (5th Cir.1966). We now do so as well.

Amici contend that a federal court should be barred from enjoining a parallel tribal court action just as it is barred from enjoining parallel state court actions. Even assuming that the Anti–Injunction Act pertains to tribal courts, the analogy made by amici is imperfect. There can be no question but that the fifty states of the Union are sovereign powers within our federalist system. But Indian communities can make no such claim. As we have outlined, not all Indian communities are considered tribes and therefore sovereign powers. The community in this case may not be sovereign. Until that uncertainty is resolved, amici's contention is premature.

Consequently, the district court did not act beyond its authority when it enjoined appellants.

### III

Appellants also argue that this action should be dismissed because appellees have failed to exhaust available remedies in the Native Court. They principally rely on *National Farmers Union Insurance Co. v. Crow Tribe of Indians*, 471 U.S. 845, 105 S.Ct. 2447, 85 L.Ed.2d 818 (1985), and *Iowa Mutual Insurance Company v. LaPlante*, 480 U.S. 9, 107 S.Ct. 971, 94 L.Ed.2d 10 (1987).

In *National Farmers*, the court announced the doctrine that examination of a tribal court's civil subject-matter jurisdiction "should be conducted in the first instance in the Tribal Court itself." 471 U.S. at 856, 105 S.Ct. at 2454. The *LaPlante* Court reiterated this doctrine, explaining that "[e]xhaustion is required as a matter of comity...." 107 S.Ct. at 976 n. 8. Even a cursory reading of these two opinions reveals that the comity arises out of the "attributes of sovereignty" possessed by Indian tribes, their "inherent powers" of self-government, and the "vital role" of tribal courts in that process. *See National Farmers*, 471 U.S. at 851, 856, 105 S.Ct. at 2451, 2454; *LaPlante*, 107 S.Ct. at 975–78. Thus, before the exhaustion question can be addressed, the sovereignty question first must be resolved.

In the present case, appellants' exhaustion argument similarly assumes that either Native Village or Venetie has attained tribal status, and therefore sovereignty. As we have previously discussed, there is a serious dispute in this action on the issue of tribal status, and the district court has reserved its judgment. Here, as above, we have neither the inclination nor the necessary record to decide this issue in the first instance.

We therefore hold that at this stage of the litigation, the district court was not bound to require appellees to exhaust remedies available in the Native Court.

### IV

Finally, appellants argue that the district court abused its discretion in imposing a preliminary injunction upon their enforcement of the tax ordinance at issue.

Traditionally, there are four factors to be considered before a court decides to grant or deny preliminary injunctive relief:

1) The likelihood of the plaintiff's success on the merits;

2) the threat of irreparable harm to the plaintiff if the injunction is not imposed;

3) the relative balance of this harm to the plaintiff and the harm to the defendant if the injunction is imposed; and,

4) the public interest.

*See Los Angeles Memorial Coliseum Commission v. National Football League*, 634 F.2d 1197, 1200 (9th Cir.1980); 11 C. Wright & A. Miller, *Federal Practice and Procedure*, § 2948 at 430–31 (1973).

In *Warm Springs Dam Task Force v. Gribble*, 565 F.2d 549, 551 (9th Cir.1977),

this court treated factors two and three above as a single factor (*citing Alpine Lakes Protection Society v. Schlapfer,* 518 F.2d 1089, 1090 (9th Cir.1975)), and further noted that factor four is but one more interest to be balanced along with the interests of the parties. *Id.* Thus, there essentially are only two factors to be considered: The likelihood of the plaintiff's success on the merits; and, the relative balance of potential hardships to the plaintiff, defendant, and public.

■ These two factors have been employed in a test framed in the alternative. Basically, plaintiffs are entitled to preliminary injunctive relief if:

1) They demonstrate
   · a probable success on the merits, and
   · a possibility of irreparable injury;
2) or if they demonstrate
   · a fair chance of success on the merits (*i.e.* serious questions are raised), and
   · the balance of hardships tips sharply in their favor.

*See Lopez v. Heckler,* 713 F.2d 1432, 1435 (9th Cir.1983); *Miss Universe, Inc. v. Flesher,* 605 F.2d 1130, 1134 (9th Cir.1979); *William Inglis & Sons Baking Company v. ITT Continental Baking Company, Inc.,* 526 F.2d 86, 88 (9th Cir.1975).

It is settled that the alternatives in the above test are not to be treated as two separate tests, but rather, as "extremes of a single continuum." *Benda v. Grand Lodge of International Association of Machinists & Aerospace Workers,* 584 F.2d 308, 315 (9th Cir.1978), *cert. dismissed,* 441 U.S. 937, 99 S.Ct. 2065, 60 L.Ed.2d 667 (1979). The proper approach is best summarized as follows:

> The critical element in determining the test to be applied is the relative hardship to the parties. If the balance of harm tips decidedly toward the plaintiff, then the plaintiff need not show as robust a likelihood of success on the merits as when the balance tips less decidedly. *Aguirre v. Chula Vista Sanitary Service,* 542 F.2d 779 (9th Cir.1976).

*Id.; see also Inglis,* 526 F.2d at 88.

■ Focusing initially on the harm that appellees would suffer in the absence of injunctive relief, the district court was persuaded by two arguments. First, it was persuaded that the other 200 native villages in Alaska would be prompted to engage in similar taxation which would create tremendous uncertainty and difficulty for the State and other businesses providing services to those villages. Second, it was persuaded that if appellees paid the alleged tax liability and litigated in the Native Court, the amount paid would be unavailable for reimbursement if appellees ultimately prevailed.

The first argument is persuasive in light of the posture of this action and political realities in the State. We note, as did the parties and the district court, that this action presents a question of first impression. One amicus brief informs us of at least one similar action pending in the District of Alaska. *See Alyeska Pipeline Service Co. v. Kluti Kaah Native Village of Copper Center,* No. A87–201 Civil (D.Alaska). The other amicus briefs informs us that it was filed on behalf of over 180 Native Alaskan Communities that "have a vital interest in the issues presented in this appeal." Thus, the district court was acknowledging obvious and substantial developments in the area of Native Alaskan taxation, and the high profile of this particular action. It is not unrealistic to conclude that a decision denying this preliminary injunction would add fuel to the engines of Native Alaskan taxation, have a chilling effect on potential contractors, and subject the State to a significant financial burden (as a result of either paying the future levies or litigating their validity).

The second argument is equally compelling. As a poor community, Native Village probably has many immediate uses for its first tax revenue. The non-existence of other taxable commercial ventures within the former Reservation indicates that expenditures from the tax fund will not be offset by future revenue. Thus, if it became necessary to reimburse appellees, it is highly unlikely that Native Village would be able to do so, even in the face of a federal court order. Alternatively, if ap-

pellees ignored the Native Court proceeding, their property would be exposed to attachment following the entry of a default judgment against them.

On the other hand, we agree with the district court that appellants will suffer no measurable hardship. This is a new tax ordinance that has never been a source of revenue. Appellees simply are not dependent on the ordinance or the particular levy in this case. At best they may have the $160,000 earmarked to alleviate existing hardships in their community. But these hardships are not the result of the district court's preliminary injunction.

As to the public interest, we believe it favors this preliminary injunction. Certainly, public policy encourages tribal courts as part of the self-determination of Indian tribes. *See LaPlante,* 107 S.Ct. at 977. It also encourages exhaustion of tribal remedies. *Id.* However, these policies would not be furthered if an Indian community, which is not a sovereign tribe, exercises powers that it clearly does not possess. Therefore, until it is decided that either Native Village or Venetie is a sovereign tribe, proceedings in the Native Court could not be in the public interest.

Furthermore, judicial economy is always a policy consideration. If appellants ultimately prevail in federal court on the tribal-status question, the most they could lose by virtue of this injunction is time (assuming that exhaustion would then be required). On the other hand, if appellants do not prevail on that question, this injunction will have saved them an unnecessary drain on the tribal judicial system. The public interest seems best served by minimizing the potential loss and imposing the injunction.

Consequently, we see the balance of hardships and interests tipping decidedly in favor of appellees and the injunction. The next consideration is the likelihood of appellees success on the merits.

■■■ The merits of this action concern whether appellants have jurisdiction to tax appellees' business activities in Native Village. The power to tax "is an inherent and essential part of the authority of any government. The power is therefore an aspect of the retained sovereignty of Indian tribes except where it has been limited or withdrawn by federal authority." F. Cohen, *Handbook on Federal Indian Law* 431 (1982) (footnote omitted). A tribe exercises its sovereign governmental authority within its tribal territory. The governing legal term for tribal territory is "Indian country." *Id.* at 27. Thus, it follows that a tribal tax is only valid within the confines of Indian country.

Congress has defined Indian country as follows:

> Except as otherwise provided in sections 1154 and 1156 of this title, the term "Indian country", as used in this chapter, means (a) all land within the limits of any Indian *reservation* under the jurisdiction of the United States Government, notwithstanding the issuance of any patent, and, including rights-of-way running through the reservation, (b) all *dependent Indian communities* within the borders of the United States whether within the original or subsequently acquired territory thereof, and whether within or without the limits of a state, and (c) all Indian *allotments*, the Indian titles to which have not been extinguished, including rights-of-way running through the same.

18 U.S.C. § 1151 (emphasis added). This definition applies to both criminal and civil jurisdiction. *California v. Cabazon Band of Mission Indians,* 480 U.S. 202, 107 S.Ct. 1083, 1087 n. 5, 94 L.Ed.2d 244 (1987). Appellants concede that their land is not a reservation, and they make no claim to an allotment. Rather, they argue that either Native Village or Venetie is a dependent Indian community.

The term "dependent Indian community" was included in § 1151 in response to the Supreme Court's opinions in *United States v. Sandoval,* 231 U.S. 28, 34 S.Ct. 1, 58 L.Ed. 107 (1913), and *United States v. McGowan,* 302 U.S. 535, 58 S.Ct. 286, 82 L.Ed. 410 (1937). *See* Reviser's Note, 1948 Act, 18 U.S.C.A. § 1151 (1984). In those cases, the Court held that the non-reservation Indian communities in question were sufficiently similar to reservation Indian

communities to be included within the meaning of Indian country. The decisions turned on the dependent nature of the communities and the federal government's role as regulator and protector of those communities. *See Sandoval,* 231 U.S. at 48, 34 S.Ct. at 6; *McGowan,* 302 U.S. at 537–39, 58 S.Ct. at 287–88. In one case, the community land was owned in fee simple by the Tribe, *see Sandoval,* 231 U.S. at 48, 34 S.Ct. at 6, and in the other case, title was held by the federal government. *See McGowan,* 302 U.S. at 539, 58 S.Ct. at 288.

The Supreme Court has not returned to this question since the enactment of § 1151. However, three circuits have done so. *See United States v. Azure,* 801 F.2d 336, 339 (8th Cir.1986); *United States v. Levesque,* 681 F.2d 75, 77–79 (1st Cir.), *cert. denied,* 459 U.S. 1089, 103 S.Ct. 574, 74 L.Ed.2d 936 (1982); *United States v. South Dakota,* 665 F.2d 837, 839–43 (8th Cir.1981), *cert. denied,* 459 U.S. 823, 103 S.Ct. 52, 74 L.Ed.2d 58 (1982); *Weddel v. Meierhenry,* 636 F.2d 211, 212–13 (8th Cir. 1980), *cert. denied,* 451 U.S. 941, 101 S.Ct. 2024, 68 L.Ed.2d 329 (1981); *United States v. Martine,* 442 F.2d 1022, 1023–24 (10th Cir.1971). Two very similar analyses have emerged from these cases—the *Martine* approach and the *South Dakota* approach.

In *Martine,* the Tenth Circuit approved a three-pronged analysis, considering:

1) the nature of the area;
2) the relationship of the area inhabitants to Indian tribes and the federal government; and,
3) the established practice of government agencies toward that area.

442 F.2d at 1023. In *South Dakota,* the Eighth Circuit applied a more extensive analysis, including the *Martine* considerations as well as:

1) the degree of federal ownership of and control over the area;
2) the degree of cohesiveness of the area inhabitants; and,
3) the extent to which the area was set aside for the use, occupancy, and protection of dependent Indian peoples.

665 F.2d at 839.

As these approaches illustrate, the ultimate conclusion as to whether an Indian community is Indian country is quite factually dependent. It is also dependent on whether the inhabitants constitute a tribe for legal purposes, which, as we discussed earlier, is another complex factual question. Because the record in the present case is so undeveloped, we cannot form an opinion on the merits, and like the district court, we cannot determine which party will probably succeed on the merits. However, in light of the large number of similar Native Alaskan communities in Alaska, this is a very important case raising far-reaching issues.

Because the balance of hardships tips decidedly in appellees' favor, and because serious questions are raised on the merits, the district court did not abuse its discretion in granting appellees preliminary injunctive relief. Accordingly, we affirm the district court's decision.

AFFIRMED.