The HOUSING AUTHORITY OF THE SEMINOLE NATION, Appellee,

v.

Josephine HARJO, Appellant.

No. 67999.

Supreme Court of Oklahoma.

April 17, 1990.

---

Renee Colbert Cullen, Edmond, for appellee.

L. Susan Work, Gregory H. Bigler, Oklahoma Indian Legal Services, Oklahoma City, for appellant.

SUMMERS, Justice:

Josephine Harjo, a fullblood Seminole Indian, fell behind on her monthly housing payments to the Seminole Housing Authority. The Housing Authority brought suit in the District Court of Seminole County under the state's Forcible Entry and Detainer statutes. Harjo moved to dismiss asserting that the state court had no jurisdiction over her home because it was in Indian country. She also claimed, in the alternative, certain other defenses and set-offs. The Housing Authority won below on all issues, and she appealed. The Court of Appeals affirmed but we have granted certiorari. Finding that her home was indeed in Indian country as defined by 18 U.S.C.A. § 1151(b) we reverse and order the matter dismissed.

## THE FACTS AND POSTURE OF THE CASE

Josephine Harjo inherited an undivided one-ninth interest in forty acres of restricted Seminole Indian land from her fullblood husband. The other eight-ninths interest in the land was inherited by her children and stepchildren. In 1973 she, along with three of her children, partitioned four tracts from the larger tract (comprising about six and one-half acres in all), and deeded them to the Seminole Housing Authority. The parties agree that the non-deeded land continued to hold its restricted status.

The Housing Authority agreed to build a house on each tract of land. The agreement between the Housing Authority and Harjo, termed a Mutual Help and Occupancy (MHO) Agreement, stated that Harjo would pay a specified amount each month, and that after a period of seventeen years she would own the house and the land. This agreement was part of a federally-funded program involving the Department of Housing and Urban Development (HUD), and required minimal payments of no more than seventy ($70.00) dollars, rather than requiring payment of the prevailing market rate. During the seventeen year period Harjo was considered a tenant in the house.

After approximately twelve years of payments Harjo stopped making them. The parties stipulated that she was in arrears to the extent of $1,990.00 in back payments. The housing authority filed a Forcible Entry and Detainer action, asking that judgment be entered againt Harjo for the back payments, and that the Housing Authority be given possession of the house. Harjo objected to the Court's jurisdiction. She also protested the constitutionality of 16 O.S.1981 § 11A.[1] At trial she agreed that back payments were due, but urged that a set-off be granted inasmuch as the plumbing did not work. The trial court granted judgment in favor of the Housing Authority, denied the relief requested by Harjo, and assessed attorneys' fees of $2500.00 against Harjo.

From this the defendant perfected her appeal. The Court of Appeals in an unpublished opinion affirmed the judgment of the

---

1. 16 O.S.1981 § 11A provides that all contracts for deed to real property shall be deemed mortgages except agreements (such as the one in this case) with an Indian Housing Authority.

trial court. Harjo's petition for certiorari to this Court has been granted.

## "DEPENDENT INDIAN COMMUNITY"

Harjo maintains that her house is part of a "dependent Indian community," is thus located in "Indian country", and therefore falls within federal, not state jurisdiction. Under the federal constitution, Congress has exclusive authority over Indian affairs. U.S. Const., Art. I, § 8. 18 U.S.C.A. § 1151 defines "Indian country" as

(a) all land within the limits of any Indian reservation under the jurisdiction of the United States Government, notwithstanding the issuance of any patent, and, including rights-of-way running through the reservation,

(b) all *dependent Indian communities* within the borders of the United States whether within the original or subsequently acquired territory thereof, and whether within or without the limits of a state, and

(c) all Indian allotments, the Indian titles to which have not been extinguished. . . . (emphasis added)

If indeed her house lies within Indian country then the state court was without jurisdiction to proceed in the forcible entry and detainer action. *Ahboah v. Housing Authority Kiowa Tribe,* 660 P.2d 625 (Okl. 1983).[2]

The Seminole Housing Authority disagrees with Harjo's argument, stating that the land lost its classification as Indian country when Harjo's application to have the restricted status removed from the land was granted by the court in 1973 in order to approve her deed to the Housing Authority. The Housing Authority argues that the allotted land is no longer under the superintendence of the federal government.

Both parties agree that *United States v. South Dakota,* 665 F.2d 837 (8th Cir.1981), *cert. denied,* 459 U.S. 823, 103 S.Ct. 52, 74 L.Ed.2d 58 (1982) and *United States v. Martine,* 442 F.2d 1022 (10th Cir.1971) es-

tablish the prevailing view in defining the term "dependent Indian community." *See, e.g., Alaska v. Native Village of Venetie,* 856 F.2d 1384 (9th Cir.1988); *United States v. Azure,* 801 F.2d 336 (8th Cir.1986); *United States v. Levesque,* 681 F.2d 75 (1st Cir.1982), *cert. denied,* 459 U.S. 1089, 103 S.Ct. 574, 74 L.Ed.2d 936 (1982); *Blatchford v. Gonzales,* 100 N.M. 333, 670 P.2d 944 (1984), *cert. denied,* 464 U.S. 1033, 104 S.Ct. 691, 79 L.Ed.2d 158 (1984). These two cases set forth the factors to be considered when deciding whether a particular area falls within the definition of "dependent Indian community." In *Martine,* 442 F.2d at 1023, the Tenth Circuit Court of Appeals considered "the nature of the area in question, the relationship of the inhabitants of the area to Indian Tribes, and to the federal government, and the established practice of government agencies toward the area." In *South Dakota* the court at P. 839 applied a more detailed analysis, adding to the factors discussed in *Martine:*

(1) [W]hether the United States has retained 'title to the lands which it permits the Indians to occupy' and 'authority to enact regulations and protective laws respecting this territory,' (2) 'the nature of the area in question, the relationship of the inhabitants of the area to Indian tribes and to the federal government, and the established practice of government agencies toward the area,' (3) whether there is 'an element of cohesiveness ... manifested either by economic pursuits in the area, common interests, or needs of the inhabitants as supplied by that locality,' and (4) 'whether such lands have been set apart for the use, occupancy and protection of dependent Indian peoples.' (Citations omitted)

The phrase "dependent Indian community" describes and affords federal jurisdiction to those "communities which, while neither part of a federal reservation nor Indian 'allotments,' are both 'Indian' in

---

2. For other cases discussing Federal Court jurisdiction based on "Indian Country" see *DeCouteau v. District County Court,* 420 U.S. 425, 427, 95 S.Ct. 1082, 1084, 43 L.Ed.2d 300 (1975);

*McClanahan v. State Tax Comm'n of Arizona,* 411 U.S. 164, 93 S.Ct. 1257, 36 L.Ed.2d 129 (1973).

character and federally dependent." *Levesque,* 681 F.2d at 77. In general terms, the question to be answered is whether the land was "validly set apart for the use of the Indians, as such, under the superintendence of the government." *United States v. Pelican,* 232 U.S. 442, 449, 34 S.Ct. 396, 399, 58 L.Ed. 676 (1914). *See also May v. Seneca–Cayuga Tribe,* 711 P.2d 77, 82 (Okla.1986); *Abhoah v. Housing Authority of Kiowa Tribe,* supra. In *United States v. McGowan,* 302 U.S. 535, 538–9, 58 S.Ct. 286, 287–8, 82 L.Ed. 410 (1938), the United States Supreme Court instructed that the name given to the settlement, whether it be an Indian colony or an Indian reservation, is not determinative. Rather, the *Pelican* test is the ultimate test of whether a particular area is a "dependent Indian community." "[T]he ultimate conclusion as to whether an Indian community is Indian country is quite factually dependent." *Village of Venetie,* 856 F.2d at 1391. No one factor is determinative; all facts and circumstances must be considered in such a case.

▮ To resolve the issue under the *Pelican* rule, application of the factors enunciated in the later *Martine* and *South Dakota* cases is necessary. First, we must look to whether the United States retained title to the Indian land and has authority to regulate and protect the land. We note that in *United States v. Mazurie,* 419 U.S. 544, 555, 95 S.Ct. 710, 716, 42 L.Ed.2d 706 (1974), the Supreme Court explained that land can be considered "Indian country" even though the title to the land is held by non-Indians.[3] *See also Seymour v. Superintendent,* 368 U.S. 351, 82 S.Ct. 424, 7 L.Ed.2d 346 (1962). Harjo inherited her restricted Indian allotment from her husband. The land maintained its restricted status until 1973 when she deeded a portion of the land to the Housing Authority in order for a house to be built. Thus, because it was a restricted or, as sometimes called, a "restricted fee" allotment, Harjo, the individual Indian, held the title to the land. *See* Cohen, *Federal Indian Law* 617 (1972). The non-deeded tract maintained its restricted status and is clearly under the control of the federal government. Thus, although the United States did not have title to the deeded land, it did continue its "superintendence" of the property for the duration of the MHO Agreement.

This "superintendence" is evident in the comprehensive federal regulations which govern MHO programs. All procedures for participation in the housing program administered by the Seminole Housing Authority are determined by HUD, a federal agency. These procedures are found in some 75 pages of federal regulations at 24 CFR Ch. IX (4–1–89 Ed.) §§ 905.101–905.430. The Housing Authority can only participate in this program after first being approved by both HUD and the Department of the Interior. *See* § 905.108. They provide for how each Indian Housing Authority (such as the Seminole Housing Authority here) must select applicants based on federal preferences for low income Indian families on Indian reservations "and other Indian areas". *See* § 905.406(a). They provide that in the event of the death, mental incapacity, or abandonment of the home by the Indian homebuyer, such homebuyer may be succeeded only by a member of the homebuyer's family who is an authorized occupant of the home in accordance with the MHO Agreement. *See* § 905.425(b)(d). The regulations also specifically require compliance with federal laws involving environmental protections, wage controls and health and safety precautions. *See* § 905.107. Although the "restrictions were removed" by the District Court in order for Harjo to deed the land to the Housing Authority, it would not be

**3.** In *Mazurie,* the statute in question was 18 U.S.C.A. § 1154(c), which exempts from the definition of Indian country those "fee patented lands in non-Indian communities," without defining "non-Indian communities". Apparently, large sections of land in the Indian reservation involved had been sold to non-Indians. Mazurie operated a bar on land within a reservation but owned by non-Indians. He was convicted of introducing spiritous beverages into Indian country. The Supreme Court upheld the conviction, holding that the surrounding circumstances indicated that the bar was indeed located in an Indian community, regardless of who held the title, and qualified as being in Indian country under § 1151(a).

correct to conclude that such land owned by the Authority subject to an MHO Agreement is free of U.S. governmental superintendence—The U.S. Government through the HUD regulations controls virtually every foreseeable legal consideration touching the property until the MHO Agreement runs its course or sooner terminates. Later we will refer to a few more examples of how this is so.

The second inquiry is into the nature of the area, and the relationship of the inhabitants to Indian tribes and to the federal government. *South Dakota*, 665 F.2d at 839; *Martine*, 442 F.2d at 1023. Also important is the the established practice of government agencies with regard to the territory. Testimony revealed that Harjo was a fullblood Seminole Indian and was associated with the Tribe. The Seminole Tribe appoints the commissioners of the Housing Authority. The Tribe also created the Indian Health Service, which contracted to build the sewage lagoon for Harjo's house and the three surrounding houses of her children. This organization also provides other health services to the community. The Tribe provides various services to the community such as vocational training, commodity food distribution programs, manpower programs and a head-start program. The schools receive scholarships and funds through the Bureau of Indian affairs, a federal agency. These funds include money from the Johnson O'Malley program, which is a federal program to provide money to Indian children for additional educational benefits.

The Seminole Housing Authority receives all of its funding from HUD. As we have said the program under which Harjo's house was built was designed to provide housing to Indian people with low incomes. All participants in this program are Indian. A policy of the program is to keep the houses within the Indian family, especially if the land was donated. Indian contractors are given preference in construction of such programs. *See* § 905.309. The procedures and requirements for participation in the program are established in great detail by HUD. Under the supervision of HUD, the Housing Authority is required to conduct yearly inspections of the premises to determine whether federal regulations are met and followed.

Clearly, the federal government remains involved and concerned in the well-being of the Seminole Indians in this area. The government administers the various programs, such as school funding and the Mutual Help and Occupancy program, by overseeing the procedures used and the criteria for the receipt of benefits. Government agencies, such as HUD and the Bureau of Indian Affairs, are the conduit through which the benefits are distributed.

The third *South Dakota* consideration is whether there is an element of cohesiveness shown by the economic pursuits and common interests of the locality. There was testimony that Harjo and her family were part of a particular band, or political unit, of the Seminole Tribe. Dr. Richard Sattler, an anthropologist, testified that the bands attempted to settle into communities by obtaining joint parcels of land. He further testified that traditional Seminole settling patterns were "such that a woman and her daughters would be living in the house[s] adjacent to each other, also especially unmarried men related to them would be living in the same area in a pattern." Tr. 83 (October 14, 1986). This pattern of families remaining geographically close has continued, although it is not as strong. A total of twenty-one Indians live within the boundaries of the original 40 acre allotment, with four households in a cluster of homes on the 6½ acres deeded to the Housing Authority for the construction of their homes, and another household in the old homestead.

In the area surrounding Harjo there are three Indian churches and a ceremonial ground. Although non-Indians may attend the churches, the expert testified that he had never seen a non-Indian at any of the services. Much of the services is conducted in the native Indian language. As for the ceremonial ground, non-Indians are not allowed to attend ceremonies unless they have special permission from the ceremonial chief. This ceremonial ground is located only a few miles from Harjo's house. A

large number of the Indians living in the area maintain their native language, which indicates an "ongoing native community." Tr. 85.

The last factor considered in *South Dakota* was whether the lands were "set apart for the use, occupancy and protection of dependent Indian peoples." *Id.* 665 F.2d at 839. In the present case, the land owned by Harjo and deeded to the Housing Authority was a restricted allotment, inherited from her husband. Her husband, a fullblood Seminole Indian, inherited the land from his mother, also a Seminole. The Seminole Housing Authority built the house with federal money specifically for the Indian occupant, with a contractual obligation to deed it back to her after a certain number of low monthly payments. The land was clearly set apart for the benefit of Indians.

The reasoning in *South Dakota* is a helpful guide when considering the facts presented in the case at bar. The Court there, finding that the housing project was a "dependent Indian community," explained that the test was a "flexible one, not tied to any single technical standard such as percentage of Indian occupants." *Id.* at 842, *quoting United States v. Mound*, 477 F.Supp. 156, 160 (D.S.D.1979). The *South Dakota* court found it important that the housing project was originated to provide for the health, safety, morals and welfare of the Sisseton–Wahpeton Sioux Tribe. The land was leased by the Housing Authority to build and operate a low-income housing project. Similar to our case, in *South Dakota* the commissioners of the Housing Authority were appointed by the Tribe. The Tribe provided a broad range of services to those living in the housing community, such as a food stamp program and senior citizen program. The federal government, through agencies like the BIA and HUD, administered the programs and its procedures. The federal government, working with the state government, provided services such as street repair. The children attended public schools, which were at least partially funded by the federal government. The project, although predominately occupied by Indians, was open to non-Indians.

We find the *South Dakota* rationale persuasive when applied to the facts before us. Harjo's house was built in order to provide her with sanitary and safe living quarters. She, in exchange for the house, deeded a portion of her inherited land to the Housing Authority. The federal government was extensively involved in the building and financing of the house. The Tribe also participated in the transaction by providing other needed services. Harjo's house was situated in an area heavily populated by Seminole Indians, and she was in fact living in a traditional arrangement, with her children living within a few feet of her own home.

A similar situation was presented in *Ahboah v. Housing Authority of the Kiowa Tribe*, supra. There, the appellant was a Kiowa Indian who was the beneficial owner of land known as a "trust" allotment. He leased his land to the Kiowa Housing Authority in exchange for a house which was built by the housing authority on the leased land. Later, the Housing Authority filed in the state District Court a Forcible Entry and Detainer action for past due rent. The Indian argued that the state did not have jurisdiction. This Court, relying on Section 1151(c),[4] held that the lease of Indian land to the Housing Authority did not deprive it of its Indian character, that it was indeed Indian country, and that the action in state court must fail for want of jurisdiction. Citing *United States v. Pelican*, 232 U.S. at 449, 34 S.Ct. at 399, we agreed that the ultimate test was whether the land had been set apart for the use of the Indians, under the superintendence of the federal government. Under this test, the land was held to be "Indian country." Although today's case revolves around Section 1151(b), rather than 1151(c) as did *Ahboah*, we find that case to be consistent with our holding here. In *Ahboah* the Indian owned an equitable interest in the land by virtue of the

---

**4.** 18 U.S.C. § 1151(c) includes within "Indian country"

"all Indian allotments, the Indian titles to which have not been extinguished."

trust allotment. Here the Indian (formerly the fee owner) became owner of an equitable interest in the land by virtue of the occupancy agreement with contract for deed. An affirmative determination of Indian country may be reached under any of the three subparagraphs of 18 U.S.C. § 1151.

The language and reasoning of *South Dakota, Martine,* and *Ahboah* lead us to conclude that Harjo's house is situated in a "dependent Indian community." Because of that it falls within the Section 1151(b) definition of "Indian country." Hence, the state district court was without jurisdiction to hear this suit.[5] In making this finding, "we are not expanding the definition of a dependent Indian community to include a particular locale merely because a small segment of the population consists of Indians receiving various forms of federal assistance." *South Dakota,* 665 F.2d at 843. This holding is factually specific, and should not be taken to imply that any house built by an Indian housing authority will be adjudged to fall within the definition of "dependent Indian community." Further, it has been held that Indian country may lose that status. "The important consideration is what the land in question is now, not what it may become in the future." *South Dakota,* 665 F.2d at 842, citing *Pelican, supra.* Our holding should not be construed to extend beyond the life of the MHO Agreement, should the Housing Authority execute to Harjo or anyone else a deed free and clear of Indian restrictions.

As to Harjo's proposition that the trial court erred by awarding attorney's fees to the Housing Authority, we must agree. This case is not a matter properly litigable in the state courts of Oklahoma.

The opinion of the Court of Appeals is hereby vacated, the judgment of the District Court is reversed, and the case is remanded with instructions to dismiss.

LAVENDER, DOOLIN, ALMA WILSON and KAUGER, JJ., concur.

HARGRAVE, C.J., OPALA, V.C.J., and HODGES and SIMMS, JJ., dissent.

HARGRAVE, Chief Justice, joined by OPALA, Vice Chief Justice, HODGES and SIMMS, Justices, dissenting:

The majority opinion refuses to apply Oklahoma law to land once owned by an Indian, now deeded to the appellee after the restrictions were removed. Once restrictions are removed from land held by an Indian, that property is subject to the laws of this state just as any other citizen's property. *Sperry Oil & Gas Co. v. Chisholm,* 264 U.S. 488, 44 S.Ct. 372, 68 L.Ed. 803 (1923). To re-impose these restrictions for what amounts to equitable reasons as the Court has done by borrowing from criminal law's definition of Indian Country is a gratuitous step which casts a cloud, potentially, on all land ever released from restrictions. That this uncertainty cannot be resolved by a search of the record chain of title indicates the magnitude of the problem introduced by this opinion.

In *Sperry Oil & Gas Co. v. Chisholm, supra,* the Supreme Court of the United States held, in a case arising from Oklahoma, that a lease of the homestead was valid even though the wife did not execute it because the land was restricted and the lease was approved by the Secretary of the Interior. The lease covered a surplus allotment also. As to the surplus allotment, the Court said:

... All restrictions upon this land had been removed by the Act of 1908. When the extension lease was executed there was no limitation under the acts of Congress upon Chisholm's right to alienate, encumber, or lease this tract. It has

---

5. But see *Fed. Land Bank v. Burris,* 790 P.2d 534 (Okl.1990), wherein we recently held that state courts have jurisdiction over foreclosure proceedings of restricted Indian land where the mortgage has been approved by the Secretary of the Interior. That holding was based on what we perceive to be an express grant of jurisdic-

tion in 25 U.S.C. § 483a, a statute that extinguishes the "restricted Indian" nature of a land title in such foreclosure proceedings. Neither § 483a nor any counterpart serves in this case to confer state jurisdiction; we are confined to 18 U.S.C. § 1151 and its interpretations in determining the Harjo tract to be Indian Country.

become *in all respects* subject to his control, under the laws of the state, just as the property of other citizens. *Jefferson v. Winkler*, 26 Okla. 653, 664, 110 Pac. 755 (1910). All questions pertaining to its disposal fell under the scope and operation of those laws. *Dickson v. Luck Land Co.*, 242 U.S. 371, 375, 61 L.ed. 371, 37 Sup.Ct.Rep. 167 [169]. (emphasis added)

See *Billy v. LeFlore County Gas & Electric*, 190 Okl. 88, 120 P.2d 774, at 779 (1941).

The necessary and initial criterion to determine whether this place had ceased to be Indian Country is whether the Indian title had or had not been extinguished. *Townsend v. United States*, 265 F. 519 (1920), citing: *United States v. Pelican*, 232 U.S. 442, at 449, 34 S.Ct. 396, at 399, 58 L.Ed. 676 (1914); *Donnelly v. United States*, 228 U.S. 243, at 269, 33 S.Ct. 449, at 458, 57 L.Ed. 820, Ann.Cas. 1913E, 710 (1913); *United States v. Celestine*, 215 U.S. 278, at 285, 30 S.Ct. 93, at 94, 54 L.Ed. 195 (1909); *Dick v. United States*, 208 U.S. 340, at 352, 28 S.Ct. 399, at 402, 52 L.Ed. 520 (1908); *Ex parte Crow Dog*, 109 U.S. 556, at 561, 3 S.Ct. 396, at 399, 27 L.Ed. 1030 (1883); *Bates v. Clark*, 95 U.S. 204, at 208, 24 L.Ed. 471 (1877). These citations are brought up to date by noting the more recent case of *Mescalero Apache Tribe v. Jones*, 411 U.S. 145, 93 S.Ct. 1267, 36 L.Ed.2d 114 (1973). Therein the United States Supreme Court held that land leased to the tribe located outside the boundaries of a reservation and *leased from* the *United States* Forest Service for a term of thirty years was *NOT* Indian Country.

The citation in the majority opinion of *United States v. Pelican, supra*, for the definition of Indian Country is instructional. *United States v. Pelican's* issue revolved around the question of whether land owned in severalty by an Indian under restriction was Indian Country just as if it had been owned in common by the tribe. The following illustrative quotes are from 232 U.S. at 447, 34 S.Ct. at 398:

Although the lands were alloted in severalty, they were to be held in trust by the United States for twenty-five years for the sole use and benefit of the allottee, or his heirs, and during this period were to be inalienable. That the lands, being so held, continued to be under the jurisdiction and control of Congress for all governmental purposes relating to the guardianship and protection of the Indians, is not open to controversy. (citations omitted)

and 232 U.S. at 449, 34 S.Ct. at 399:

... In the present case, the original reservation was Indian country simply because it had been validly set apart for the use of the Indians as such, under the superintendence of the government. *Donnelly v. United States*, 228 U.S. 243, 271, 272, 57 L.ed. 820, 832, 33 Sup.Ct. Rep. 449 [458, 459], Ann.Cas. 1913E, 710. The same considerations, in substance, apply to the allotted lands which, when the reservation was diminished, were excepted from the portion restored to the public domain. The allottees were permitted to enjoy a more secure tenure, and provision was made for their ultimate ownership without restrictions. But, meanwhile, the lands remained Indian lands, set apart for Indians under governmental care; and we are unable to find ground for the conclusion that they became other than Indian country through the distribution into separate holdings, the government retaining control.

A vain search has been made for authority transplanting the definition of Indian Country found in 18 U.S.C. § 1151 into the civil law of real property, as opposed to taxation. The local authority relied upon for transplantation of the Indian Country concept is *Ahboah v. Housing Authority of Kiowa Tribe*, 660 P.2d 625 (1983). Therein this Court said although 18 U.S.C. § 1151 ostensibly applies only to issues of criminal jurisdiction, the United States has recognized its general applicability to questions of civil jurisdiction. The statement is broader than the fact. It has been utilized, as far as can be told, in taxation and criminal jurisdictional settings, and they generally have some relation to reservation sta-

tus. The cases cited in *Ahboah v. Housing Authority of Kiowa Tribe, supra,* for this supposition are: *Moe v. Confederated Salish & Kootenai Tribes,* 425 U.S. 463, 96 S.Ct. 1634, 48 L.Ed.2d 96 (1976); *DeCoteau v. District County Court,* 420 U.S. 425, 95 S.Ct. 1082, 43 L.Ed.2d 300, N. 2 (1975); *McClanahan v. Arizona Tax Commission,* 411 U.S. 164, 93 S.Ct. 1257, 36 L.Ed.2d 129, N. 17 (1973). These cases all deal with actual reservation issues. *Moe v. Confederated Salish & Kootenai Tribes, supra,* states that state tax laws taxing Indians producing income residing on an Indian reservation are not authorized whether the Indian holds by patent within a reservation or resides on land held in trust for the tribe. *DeCoteau v. District County Court, supra,* held South Dakota state courts have civil and criminal jurisdiction over tribal members on non-Indian unallotted lands within the reservation's 1876 borders. The third case cited in *Ahboah v. Housing Authority of Kiowa Tribe, supra,* is *McClanahan v. Arizona Tax Commission, supra.* The case also dealt exclusively with the question of state tax on income as applied to reservation Indians with respect to income derived wholly from reservation sources. This case *does* state that generally state laws do not apply to *tribal Indians* on Indian *reservations.* Indian Country analysis is then properly applicable only to land held by Indians or by the government for the use and benefit of Indians, as expressed below in the quotation from *Alaska ex rel. Yukon Flats School District v. Native Village of Venetie,* 856 F.2d 1384 (9th Cir.1988). The majority relies upon *U.S. v. Mazurie,* 419 U.S. 544 at 555, 95 S.Ct. 710 at 716. At p. 555, 95 S.Ct. at p. 716 the Court's holding appears thusly: "We hold that neither the Constitution nor our previous cases leave any room for doubt that Congress possesses the authority to regulate the distribution of alcoholic beverages by establishments such as the Blue Bell." The facts of the case, and also the law applicable to those facts differ from the issue this Court now faces. The case is a prosecution for selling liquor within an Indian reservation without a liquor permit from the tribe, and after such a permit had been denied subsequent to a hearing and protest from tribal members. The law applicable is also dissimilar to the case before this Court as demonstrated by the Court's quotation of 18 U.S.C. § 1151(a) as follows:

> "(a) All land *within the limits of any Indian reservation* under the jurisdiction of the United States Government, notwithstanding the issuance of any patent, and including right-of-way running through *the reservation ...*" (emphasis added)

Without belaboring the point, it is necessary to note that the land involved in this action is not alleged to be, nor is it, within an Indian reservation. The *Mazurie* case is bottomed on the *reservation* provision of § 1151(a), and upon the exception for fee-patented lands in non-Indian communities on reservations as that exception is used in 18 U.S.C. § 1154(c). The true significance of the case is that the owner of a saloon (holding a license to do business from the State) located inside reservation boundries may be prosecuted when it continues to do business after tribal authorities have denied the owner's application for a tribal license to sell alcoholic beverages on the reservation.

The majority opinion also cites *Alaska ex rel. Yukon Flats School District v. Native Village of Venetie, supra,* for the proposition that "Indian Country" as a term applies to both civil and criminal jurisdiction. This may be so, but the citation does not aid the majority in determining that Indian Country need be neither on a reservation, nor owned by an Indian. The land under question in *Venetie* was **owned by the tribe,** furthermore in that opinion we find the following:

> ... Appellants concede that their land is not a reservation, and they make no claim to an allotment. Rather, they argue that either Native Village or Venetie is a dependent Indian community.

The term "dependent Indian community" was included in § 1151 in response to the Supreme Court's opinions in *United States v. Sandoval,* 231 U.S. 28, 34 S.Ct. 1, 58 L.Ed. 107 (1913), and *United States*

*v. McGowan,* 302 U.S. 535, 58 S.Ct. 286, 82 L.Ed. 410 (1937). *See* Reviser's Note, 1948 Act, 18 U.S.C.A. § 1151 (1984). In those cases, the Court held that the non-reservation Indian communities in question were sufficiently similar to reservation Indian communities to be included within the meaning of Indian country. The decisions turned on the dependent nature of the communities and federal government's role as regulator and protector of those communities. *See Sandoval,* 231 U.S. at 48, 34 S.Ct. at 6; *McGowan,* 302 U.S. at 537–39, 58 S.Ct. at 287–88. In one case, the community land was owned in fee simple by the Tribe, *see Sandoval,* 231 U.S. at 48, 34 S.Ct. at 6, and in the other case, title was held by the federal government. . . .

The most recent exposition of the basis for the objection to the majority opinion arises from a quotation from *State ex rel. May v. Seneca Cayuga Tribe,* 711 P.2d 77, at 85 (Okl.1985), as follows. "Generally speaking, states have authority over non-Indians in Indian Country unless there is a conflict with federal law. States may also exercise authority over Indians and their activities outside Indian Country ... a continuing body of case law indicates that the areas of sanctioned state jurisdiction are growing ..." (footnotes omitted).

Against this backdrop, the two tests currently used to question state jurisdiction are infringement upon tribal self-government and preemption by federal action. There is no basis for finding preemption in the present case, as we are dealing with land held neither in a restricted manner nor by an Indian. As noted above, state law has always controlled unrestricted land not held in Indian hands. Secondly, no basis can be discerned for holding state law applicable to non-Indian held land on the basis that it is an infringement on tribal self-government.

It is a particularly anomalous result to hold state forcible entry and detainer law does not apply to land not owned by an Indian. Federal preemption is difficult to demonstrate in this area. Had the land been owned by an Indian under restriction, and mortgaged, the mortgage could be foreclosed utilizing state law under the provisions of 25 U.S.C. § 491 (1982). Consequently no preemption can be demonstrated in the area of enforcing payment for habitation furnished.

The majority opinion notes that both parties agree that *United States v. South Dakota,* 665 F.2d. 837 (8th Cir.1981) cert. denied, 459 U.S. 823, 103 S.Ct. 52, 74 L.Ed.2d 58 (1982), establishes the prevailing view of the definition of dependent Indian community, so as to establish this property as Indian Country. It should be noted that in the first part of that opinion discussing the facts of the case is a subheading entitled "Title to the Land". There it is stated, " . . . The land eventually came into possession of St. Peter's Church of Sisseton, South Dakota, which transferred it to the United States *in trust* for the Sisseton–Wahpeton Sioux Tribe by warranty deed ..." (emphasis added). The first inquiry by the Court was a determination that the land was held in trust by the United States for the benefit of an Indian tribe. After that determination it is apparent that the land could be correctly determined Indian Country under 18 U.S.C. § 1151(b) as a dependent Indian community. Thus *United States v. South Dakota, supra,* differs on its facts in a material sense from the case at bar. As authority for holding the land in this cause Indian Country, *United States v. Martine,* 442 F.2d. 1022 (10th Cir.1971), is similarly flawed. In discussing jurisdiction under § 1151, *supra,* (in this manslaughter case) the Court said at p. 1023: "The particular place where the accident took place was neither on an Indian reservation nor on an allotment. It was in an area known as the Ramah community and on *land owned by the Navajo Tribe,* it having been purchased with tribal funds from a corporate owner. Jurisdiction therefore rests on the claim that the area in question is a dependent Indian community." (emphasis added). In the case at bar the title to this land was in a *state* agency, The Housing Authority of the Seminole Nation. That fact should be fatal to any holding that the land in question is Indian Country. The fact that the

appellant retained some of her land in her restricted status does not affect state jurisdiction over that portion not restricted. See *Chisholm, supra.* The fact that this creates a checkerboard jurisdictional problem has been recognized and determined to be a necessary result of proper legal analysis has been noted and discussed in this Court's opinion in the case of *State ex rel. May v. Seneca–Cayuga Tribe, supra.*

In accordance with the views herein expressed, I must respectfully dissent.