857 F.Supp. 734 (1994)
NATURAL RESOURCES DEFENSE COUNCIL, INC., et al., Plaintiffs,
v.
UNITED STATES DEPARTMENT OF the NAVY, et al., Defendant.
No. CV 94-2337 SVW (CTx).
United States District Court, C.D. California.
April 26, 1994.
*735 Richard B. Kendall, Janet M. Grady, Paul A. Blechner, Robert W. Stone, Sherman & Sterling, Joel R. Reynolds, Natural Resources Defense Council, Inc., Everett L. DeLano, Los Angeles, CA, for plaintiffs.
Lois J. Schiffer, Acting Asst. Atty. Gen., Charles Findlay, Brian L. Ferrell, Joseph Perella, Carol A. Petsonk, Environment & Natural Resources Div., Dept. of Justice, Washington, DC, Nora Manella, U.S. Atty., Leon W. Weidman, Asst. U.S. Atty., Chief, Civil Div., Peter Hsiao, Asst. U.S. Atty., Los Angeles, CA, for defendant.

ORDER GRANTING PRELIMINARY INJUNCTION
WILSON, District Judge.
Plaintiffs have moved for a preliminary injunction to enjoin the implementation of a regulation promulgated by the National Marine Fisheries Service ("NMFS") that authorizes the taking of marine mammals over a five-year period as a result of a United States Navy's weapons-testing program. More specifically, the Plaintiffs also seek to enjoin the Navy from conducting a specific weapons test, the ship-shock trial of the U.S.S. John Paul Jones, pursuant to a Letter of Authorization issued by NMFS to the Navy pursuant to the challenged regulation.
While recognizing that agency decisions are reviewed under the arbitrary and capricious standard, the Court has determined that plaintiffs have shown a near-certain likelihood of prevailing on the merits on their claims that the challenged regulation and the challenged letter of authorization each violate the Marine Mammal Protection Act ("MMPA") and the National Environmental Policy Act ("NEPA"), primarily because NMFS and the Navy both failed to adequately consider possible alternative sites for the planned ship-shock trial and other weapons testing.[1] The Court has further determined that the plaintiffs have shown that it is sufficiently likely that further surveying and/or consideration would locate an alternate area *736 that would result in the taking of fewer marine mammals and other animals.[2] As a result the Court has determined that the failure to issue this injunction would result in irreparable harm. The Court has therefore determined that a preliminary injunction should be granted preventing the ship shock test of the John Paul Jones and preventing the issuance of any further letters of authorization pursuant to the challenged regulation.
This order does not address the plaintiffs' claim that the regulation and letter of authorization violate the Migratory Bird Treaty Act or the NEPA requirement for the issuance of an environmental impact statement.

Summary of critical events in administrative record
(1) In May 1993, the Navy applied to NMFS for a small take authorization under the MMPA for a planned five-year testing of weapons. The Navy proposed to conduct an annual series of up to 54 underwater detonations with explosives ranging from 1 lb. to 10,000 lbs. The Navy proposed to conduct the testing in a section of offshore waters within the Outer Sea Test Range ("OSTR").
(2) The Navy's application was made available for public review on June 7, 1993, when it was published in the Federal Register and elsewhere. The period for commenting to NMFS closed on July 7, 1993.
(3) On October 14, 1993, NMFS issued an Environmental Assessment ("NMFS EA") analyzing the Navy's proposal and its projected impact on marine mammals.
The EA concluded that the 5-year testing program would not have a "significant impact" on the environment and that NMFS therefore did not have to prepare an environmental impact statement under NEPA.
(4) On October 15, 1993, NMFS published proposed regulations regarding the Navy's testing plan. Two public meetings were held in November. The comment period closed on November 29, 1993. During the comment period, NMFS received a comment that asserted that NMFS had an obligation to consider the possibility that the testing program could be conducted at an alternative site.
(5) On February 3, 1994, NMFS published its Final Rule in the Federal Register. This Final Rule is the regulation that plaintiffs challenge in this matter. The Final Rule is substantially the same as the October proposal. The Final Rule approves the Navy's 5-year testing program as in compliance with MMPA. The Final Rule authorizes the Navy to conduct the tests anywhere within the OSTR provided that the Navy obtains a letter of authorization for each test. The Final Rule states that NMFS had considered a very narrow range of alternatives to the proposed testing plan and explicitly states that NMFS did not consider the possibility of testing outside the OSTR.
(6) On March 18, 1994, the Navy issued its own environmental assessment ("Navy EA") which primarily addressed the explosive detonations necessary for the ship-shock trial of the John Paul Jones, i.e., the explosion of four to six 10,000 lb. explosives in the OSTR.
(7) On April 11, 1994, the Navy concluded that the John Paul Jones test would not have a significant environmental impact and that the Navy therefore did not have to prepare an environmental impact statement. The Navy EA contained some discussion of alternative sites outside the OSTR and within the OSTR.
(8) On April 12, 1994, NMFS issued a Supplemental Environmental Assessment ("NMFS Supplemental EA"). NMFS Supplemental EA also contained some discussion of alternative sites outside the OSTR and within the OSTR.
(9) On April 12, 1994, NMFS issued a Letter of Authorization pursuant to the Final Rule. The Letter of Authorization authorized the Navy to "take" a certain number of marine mammals in the course of testing the John Paul Jones in a section of the OSTR. The approved region for the testing lies within the Southern California Bight, an area that the Government concedes is an unusually rich area of marine life.

*737 Marine Mammal Protection Act

1. Statute and Regulations

The Marine Mammal Protection Act is codified at 16 U.S.C. §§ 1361-1407.
In Section 1361, Congress explicitly found that: (1) certain species and population stocks of marine mammals are, or may be, in danger of extinction or depletion due to man's activities; (2) such species and population stocks should not be allowed to be diminished beyond the point at which they cease to be a significant functioning element in their ecosystem and should not be allowed to be diminished below their "optimum sustainable population"; (3) further measures should be immediately taken to replenish any species that has been diminished below the optimum sustainable population; and (4) particular efforts should be made to protect the rookeries, mating grounds, and areas of similar significance for each species of marine mammal from the adverse effect of man's actions.
Section 1371(a) establishes a general "moratorium" on the "taking and importation" of "marine mammals".[3] Section 1362(13) defines "take" as "to harass, hunt, capture, or kill, or attempt to harass, hunt, capture or kill any marine mammal."
Section 1371(a) also provides for various exceptions to the general moratorium. This case involves the exception set forth in Section 1371(a)(5)(A). Section 1371(a)(5)(A) provides that "[u]pon request therefor by citizens of the United States who engage in a specified activity ... within a specified geographical region," the Secretary of Commerce "shall allow, during periods of not more than five consecutive years each, the incidental, but not intentional, taking"[4] of "small numbers of marine mammals of a species or population stock" if the Secretary:
(i) "finds that the total of such taking during each five-year (or less) period concerned will have a negligible impact on such species or stock," and

(ii) "prescribes regulations setting forth
(I) permissible methods of taking pursuant to such activity, and other means of effecting the least practicable adverse impact on such species or stock and its habitat, paying particular attention to rookeries, mating grounds, and areas of similar significance...." (emphasis added).
NMFS is the branch of the Commerce Department with responsibility for enforcing the MMPA. The implementing regulation states that NMFS must base its finding on the "best scientific evidence available." 50 CFR § 228.2. NMFS has defined "negligible impact" as "an impact ... that cannot be reasonably expected to, and is not reasonably likely to, adversely affect the species or stock through effects on annual rates or recruitment or survival." 50 C.F.R. § 228.4.

2. Violation of MMPA

The plaintiffs contend that the Final Rule and the Letter of Authorization both violate the MMPA because NMFS failed to adequately consider alternative sites in determining that a test in the planned area will cause the "least practicable adverse impact." The Court has determined that the plaintiffs have shown a near-certain likelihood of success on the merits on this legal challenge.
NMFS contends that the MMPA does not require NMFS to consider the possibility of alternative sites beyond those proposed by the applicant in determining whether the proposed project has been selected in a manner that will achieve the "least practicable adverse impact." NMFS relies primarily on the lack of any explicit mention of an alternative *738 site requirement in the MMPA and on the "specified geographic region" language in the statute.
Reflecting this statutory interpretation, the Final Rule explicitly states:
[A]lternative sites or methods were identified as being beyond the scope of the proposed action.... NMFS is of the opinion that the site determination and method of operation is the responsibility of the Navy (provided NMFS is assured that there was not a practicable alternative to ship shock testing that would result in not taking marine mammals).
The only alternatives considered by NMFS prior to promulgating the Final Rule were: (1) authorizing the program without requiring any efforts to mitigate the harm to marine mammals and (2) not authorizing the program.
The Court finds that the statute unambiguously establishes that NMFS interpretation is incorrect and that, even if the statute were ambiguous, NMFS interpretation is unreasonable. Given that the purpose of the MMPA was to reduce as much as practicable the taking of marine mammals, the Court concludes that the MMPA requires NMFS to consider alternative sites for a proposal at least when:
(a) the project does not require the use of a particular site, and
(b) the available information indicates that the proposed site is particularly likely to pose a high risk of harm to mammals.
Any other interpretation of the MMPA would allow NMFS to authorize projects that would result in the taking of an unnecessarily high number of marine mammals. NMFS interpretation of the MMPA is arbitrary and capricious.[5] While NMFS might ultimately determine that an alternative site was impracticable, the analysis of alternative sites is still mandatory.
The Navy application did not establish that the program necessitated a site within the OSTR. The Navy application to NMFS listed six requirements for the testing program:
(a) water depth of 600 feet or greater,
(b) sea state of 4 or below,
(c) operations area controllable regarding air and water traffic,
(d) visual monitoring possible during operations to detect marine life (preferably a site away from known migratory routes or habitations but within access of surveillance aircraft),
(e) location within 200 miles of the coast, and,
(f) environmentally acceptable.
Given the Navy's authority and forces, the Navy could have met these requirements at most locations within 200 miles of the West Coast or the East Coast of the United States.[6] Further, the Government concedes that the proposed project area is in or near areas of unusually high marine mammal activity. Therefore, NMFS' failure to consider alternative sites outside the OSTR prior to promulgating the Final Rule amounts to a violation of the MMPA.[7]
Separately, even if the Final Rule was lawful, the Letter of Authorization violates the MMPA. The Letter of Authorization authorizes the Navy to conduct the testing of the John Paul Jones within three square subsections of the OSTR that NMFS surveys indicate have the lowest density of marine mammals. Plaintiffs, however, have demonstrated *739 that the surveyed area was selected in an arbitrary and capricious manner. NMFS concedes that marine mammal density tends to decrease  although not uniformly  as an examined area gets further from shore. NMFS also concedes that it could practicably have surveyed an area further from shore.[8] Furthermore, NMFS effectively considered a very narrow area (approximately 1000 sq. nm. or less) since certain substantial segments of the searched area were discarded because the survey was planned and performed in a manner that did not produce statistically reliable data for these substantial segments.[9] Among the somewhat surveyed, but ultimately not considered areas, were two or three regions with preliminary population densities lower than the selected regions (an unsurprising result since the discarded regions were further from shore than the target regions).
While the administrative record between the date that the regulation was promulgated and the date that the letter of authorization was issued does discuss NMFS' analysis that weather conditions may impede mitigation efforts in regions west of the surveyed area, the decision not to consider sites further from shore was still arbitrary and capricious. Nowhere in the record does NMFS or the Navy consider the possibility that the possible impairment of mitigation efforts as one analyzes sites further from shore might be outweighed by reductions in mammal density. The ability of NMFS and the Navy to consider this possible tradeoff was severely impaired by the unnecessary decision not to conduct a density survey beyond the 60 mile radius.
The Court concludes that the failure to survey further offshore violated the MMPA because it arbitrarily excluded particularly promising regions from the survey.

National Environmental Policy Act
Plaintiffs have also alleged that the failure to consider alternative sites violates the National Environmental Policy Act ("NEPA"). The National Environmental Policy Act ("NEPA") is codified at 42 U.S.C. §§ 4321-4347. Section 4332(2)(C) requires that all agencies of the Federal Government shall prepare an adequate "environmental impact" statement for "major Federal actions significantly affecting the quality of the human environment." The purpose of NEPA is to assure that federal agencies are fully aware of the impact of their decisions on the environment. Friends of Endangered Species, Inc. v. Jantzen, 760 F.2d 976, 985 (9th Cir.1985). NEPA is primarily a procedural statute. Save the Yaak Committee v. Block, 840 F.2d 714, 717 (9th Cir.1988).
Plaintiffs contend that the Final Rule and the Navy decision to proceed with the testing program violate NEPA due in part to the failure to issue an environmental impact statement. This order does not address this contention.
Plaintiffs separately contend that the Final Rule and the Letter of Authorization and the decision to proceed with the ship-shock test of the John Paul Jones violate NEPA due to the failure of NMFS and the Navy to consider alternative sites. In Bob Marshall Alliance v. Hodel, 852 F.2d 1223, 1228-1230 (9th Cir.1988), cert. denied sub nom. Kohlman v. Bob Marshall Alliance, 489 U.S. 1066, 109 S.Ct. 1340, 103 L.Ed.2d 810 (1989), the Ninth Circuit held that "consideration of alternatives" is required by 42 U.S.C. § 4232 "even where a proposed action does not trigger the EIS process." "[A]ny proposed federal action *740 involving unresolved conflicts as to the proper use of resources triggers NEPA's consideration of alternatives requirement." Id. at 1229. Alternatives must be given "full and meaningful consideration." Id. (emphasis added). The agency must consider reasonable alternatives within the range determined by the "nature and scope of the proposed action." Idaho Conservation League v. Mumma, 956 F.2d 1508, 1520 (9th Cir.1992) (citation omitted).
The Final Rule and the Letter of Authorization were both issued and the Navy's plan to proceed with the ship-shock trial was made without the required examination of alternatives. The Final Rule's promulgation was premised on an impermissible determination that alternatives outside the OSTR did not have to be considered. NMFS' issuance of the Letter of Authorization and the Navy's decision to proceed with the John Paul Jones test were similarly flawed. Both relied upon a site selection survey that was constructed in an arbitrary and capricious manner and that excluded reasonable alternatives that met the requirements of the proposed action. The Court therefore concludes that plaintiffs have shown a near-certain probability of success in showing a NEPA violation.

Preliminary Injunction Analysis
To obtain a preliminary injunction, a movant must show (1) a likelihood of success on the merits and the possibility of irreparable injury, or (2) sufficiently serious questions going to the merits and a balance of hardships tipping sharply in the party's favor. Johnson Controls, Inc. v. Phoenix Control Systems, Inc., 886 F.2d 1173, 1174 (9th Cir.1989); Friends of the Earth v. U.S. Navy, 841 F.2d 927, 933 (9th Cir.1988). The preliminary injunction test is viewed as establishing a continuum of fact and legal patterns between the two stated possibilities. Johnson Controls, 886 F.2d at 1174; Alaska ex rel. Yukon Flats School Dist. v. Native Village of Venetie, 856 F.2d 1384, 1389 (9th Cir.1988).
In Amoco Production Co. v. Gambell, 480 U.S. 531, 541-546, 107 S.Ct. 1396, 1402-1404, 94 L.Ed.2d 542 (1987), the Supreme Court held that a movant who has shown a legal violation must still show "irreparable injury." In Amoco, the Supreme Court held that a violation of a procedural element of a substantive statute does not per se constitute irreparable injury and that a Court must look to the substantive purpose of the violated statute. The Ninth Circuit has held that "when environmental injury is `sufficiently likely, the balance of harms will usually favor the issuance of an injunction to protect the environment.'" Sierra Club v. U.S. Forest Service, 843 F.2d 1190, 1195-1196 (9th Cir. 1988) (quoting Amoco); see Diamontiney v. Borg, 918 F.2d 793, 795 (9th Cir.1990) (plaintiff must show "strong threat of irreparable injury") (quoting Wright & Miller).
In the present case, the Court, like the Sierra Club Court, is unsure whether Amoco applies when a movant has shown the violation of a statute that is nearly purely procedural. Public Service Co. of Colorado v. Andrus, 825 F.Supp. 1483, 1505 (D.Idaho 1993); see Sierra Club, 843 F.2d at 1195 (noting Amoco was not a NEPA case). Compare Huntington v. Marsh, 884 F.2d 648, 652-653 (2d Cir.1989), cert. denied, 494 U.S. 1004, 110 S.Ct. 1296, 108 L.Ed.2d 473 (1990) (NEPA violation does not necessitate injunction) with Sierra Club v. Marsh, 872 F.2d 497, 501-504 (1st Cir.1989) (Breyer, J.) (NEPA violation generally requires injunction). If Amoco does not apply to a NEPA violation, the injunction should issue.
However, as in Sierra Club, the Court does not believe that this question needs to be resolved because plaintiffs have shown that irreparable environmental injury is sufficiently likely as a result of the MMPA and NEPA violations.[10] The best available evidence indicates that the proposed test location in particular and much of the OSTR in general is in a region with a particularly dense marine mammal population.[11] With respect to the regulation, this evidence indicates that an East Coast location is sufficiently *741 likely to have a lower marine mammal population. With respect to the letter of authorization, the evidence indicates that the unsurveyed area south and/or west of the planned test sites is likely to have regions with lower mammal densities than the planned test sites. Even considering the possibility that mitigation would be less successful in such sites, the plaintiffs have shown a sufficient likelihood that an alternative sight would result in less harm to marine mammals.[12]
Plaintiffs have therefore shown that a preliminary injunction should issue.[13]
THE COURT HEREBY ORDERS THAT THE NAVY IS ENJOINED FROM PERFORMING A SHIP-SHOCK TEST OF THE JOHN PAUL JONES AND THAT THE NATIONAL MARINE FISHERIES SERVICE IS ENJOINED FROM ISSUING ANY FURTHER LETTERS OF AUTHORIZATION PURSUANT TO THE FINAL RULE.
After the Court made this ruling orally, the Government moved for a stay pending appeal. THE MOTION FOR A STAY PENDING APPEAL IS DENIED.
IT IS SO ORDERED.
NOTES
[1] In analyzing the likelihood of success on the merits, the Court has considered only the administrative record prior to each decision and subsequent documents that would indicate whether alternatives were analyzed prior to each decision.
[2] In making this decision, the Court is not limited to the administrative record. The analysis of the existence and magnitude of potential harms includes all evidence admitted at the hearings.
[3] Marine Mammal is defined at Section 1362(6) as "any mammal which (A) is morphologically adapted to the marine environment (including sea otters and members of the orders Sirenia, Pinnipedia and Cetacea), or (B) primarily inhabits the marine environment (such as the polar bear).

Moratorium is defined at Section 1362(8) as "a complete cessation of the taking of marine mammals."
[4] 50 C.F.R. § 228.4 states:

[I]ncidental, but not intentional, taking means accidental taking. It does not mean that the taking is unexpected, but rather it includes those takings which are infrequent, unavoidable or accidental.
[5] The "specified geographical region" language in the MMPA has significance only if NMFS determines that an applicant is practicably limited in the regions in which the applicant can conduct the proposed activity. For example, NMFS may determine that an applicant has property rights only in a limited region or that the proposed project requires a specified site.
[6] The record indicates that the Navy has previously conducted ship shock trials near Florida.
[7] Prior to the promulgation of the regulation, the administrative record does not contain any references to reasons for selecting a West Coast site rather than an East Coast site. Subsequent to the promulgation of the regulation, the Navy's EA asserted certain reasons, primarily regarding personnel concerns, for testing near San Diego. This subsequent analysis cannot be used to substitute for the reasoned analysis of alternatives which is required before a major federal decision, such as the promulgation of the disputed regulation. Furthermore, even in NMFS Supplemental EA, NMFS continued to assert that NMFS was not required independently to consider alternative sites in determining the best practicable site.
[8] NMFS concedes that it could have searched an area up to 100 miles from shore. Instead, NMFS searched an area 60 miles or less from shore because NMFS initially intended to use helicopters with a range limited to 60 miles. However, when NMFS ultimately decided to use aircraft with a range of at least 100 miles, NMFS did not expand the surveyed area or move the survey further from shore. NMFS now asserts that the survey region was not further expanded because of concerns about the feasibility of mitigation given wind conditions further west. The evidence in support of this assertion is inadequate, particularly because there is no indication of the kind of careful analysis that would be necessary to balance the possibility of impaired mitigation against the possibility of lessened densities.
[9] For some reason, NMFS aligned the boundaries of the survey area at an angle to the axes of the grid establishing the measured zones in the survey area. Thus, the survey had a preordained result of excluding substantial parts of the surveyed area due to statistically insignificant data.
[10] The Court notes that in analyzing the balance of harms the Court is not required to apply the more deferential "arbitrary and capricious" review.
[11] In making this factual finding, this Court relies, in substantial part, on the affidavits reviewed by the Court and summarized by plaintiffs' counsel at the hearing on the afternoon of April 26, 1994. See, e.g., Declarations contained in Plaintiffs' Exhibit E. The Court finds these witnesses to be persuasive in the substance of their comments and the strength of their professional credentials. These declarants establish the uniquely populous nature of the Southern California Bight, in general, and the proposed testing sights, in particular. The declarations emphasize the particularly significant topographical occurrences within the Bight, including the Patton Escarpmenta location that lies directly below one of the proposed test sites. The Court finds that the opposing declarations, including that of Dr. Barlow, offered by defendants are an inadequate rebuttal.
[12] The Court notes that NMFS and the Navy did not engage in a careful analysisor much of an analysis at allto consider whether decreases in density further to the west would more than offset any impairment of mitigation efforts. The Court also notes that the evidence of impaired mitigation efforts is somewhat uncertain and not necessarily the same throughout the year.
[13] If this Court is supposed to balance the harms, the Court would still conclude that an injunction should issue. While the Navy has shown that substantial costs in terms of money and defense preparedness will result from an injunction, the Court believes that two factors cause the balance of harms to favor the plaintiffs. First, the plaintiffs are much more likely to prevail on the merits so that it is quite likely that an improper environmental harm will occur if the injunction is denied. On the other hand, the harm to the Navy is likely the direct result of the failure to comply with the MMPA and NEPA. Second, NMFS and the Navy were notified several months ago that a challenge might be brought to the testing program if alternative sites were not considered. The Navy's projected harm is the direct result of the Navy's refusal or inability to recognize, at an earlier date, the propriety of that challenge. Thus, the balance of harms also favors plaintiffs.