670 P.2d 944

Herbert Charles BLATCHFORD, Jr.,
Petitioner-Appellee,

v.

Macario GONZALES, Administrator,
Forensic Hospital,
Respondent-Appellant.

No. 14361.

Supreme Court of New Mexico.

July 21, 1983.

Jeff Bingaman, Atty. Gen., Eddie Michael Gallegos, Asst. Atty. Gen., Santa Fe, for respondent-appellant.

Donna Chavez, Donald Juneau, Navajo Legal Aid and Defender Service, Window Rock, Ariz., for petitioner-appellee.

## OPINION

PAYNE, Chief Justice.

Blatchford, a Navajo Indian, was convicted of accessory to criminal sexual penetration and kidnapping of a Navajo Indian child, and sentenced to life imprisonment. He was confined to the state mental hospital in San Miguel County where he filed a petition for writ of habeas corpus. However, he failed to pursue his post-conviction remedies under NMSA 1978, Crim.P.R. 57(j) (Repl.Pamp.1980), before applying for the writ. The district court granted the writ over objections by the State that Blatchford failed to exhaust his remedies under Rule 57(j). In granting the writ, the court below held that the State did not have jurisdiction over Blatchford for a crime committed on Indian land. It reached this result by concluding that the situs of the offense is a dependent Indian community. We reverse on two grounds.

First, we hold that the district court is without jurisdiction to grant the writ of habeas corpus, given the fact that Blatchford failed to exhaust his post-conviction remedies.

Rule 57(j) states that "[a] prisoner must exhaust his remedy under this rule [Rule 57] before applying for a writ of habeas corpus." The main purpose of the rule is to provide a uniform procedure for determining if the prisoner is entitled to relief. It would be premature to hear applications for writs of habeas corpus if other post-conviction remedies are available.

Second, we hold that Yah-Ta-Hey, the community where the crime occurred, is not a dependent Indian community with exclusive federal jurisdiction. We will consider this issue to afford guidance in further considerations of this matter should Blatchford pursue other remedies.

## I.

The offense occurred in the Yah-Ta-Hey community, located approximately two miles from the Navajo Indian Reservation. The general area surrounding Yah-Ta-Hey has become a "checkerboard area," resulting from a sequence of Federal withdrawals and expansions of Indian reservation lands, and has been the source of some confusion on matters of jurisdiction.

Although Yah-Ta-Hey is the site of an Indian trading post and other related businesses, the trading post is owned by non-Indians and the site is on land which had been granted in fee by the United States. Sixty to seventy percent of the community is Indian. As part of their benefits of membership in the tribe, Navajos in the vicinity vote in tribal elections. But they also vote in state and county elections. Since Yah-Ta-Hey is primarily a site for Indian trading, no federal services are administered there. A Navajo living in the area who desires such services must go either to nearby Rock Springs or to Crownpoint, forty miles away, given the fact that Crownpoint has jurisdiction over the Yah-Ta-Hey area for providing many Indian services. County and state police, as well as tribal police and FBI officers, patrol the Yah-Ta-Hey community. The Navajo Tribal Code recognizes the Yah-Ta-Hey area as within its jurisdiction and consequently has designated Yah-Ta-Hey as a Chapter where meetings and tribal businesses are conducted.

## II.

Blatchford contends that the situs of the crime scene, Yah-Ta-Hey, is "Indian country" as defined by 18 U.S.C. Section 1151 (1976), so as to require exclusive federal jurisdiction under 18 U.S.C. Section 1153 (1976). We do not agree.

The term "Indian country" as used in Section 1151 includes Indian reservations, dependent Indian communities, and all Indian allotments. Since Yah-Ta-Hey is neither located on an Indian reservation nor on an allotment, jurisdiction rests on the claim that the area in question is a dependent Indian community within Indian country.

Section 1151(b) defines "Indian country" as:

> all dependent Indian communities within the borders of the United States whether within the original or subsequently acquired territory thereof, and whether within or without the limits of a State, * * *

The foregoing language resulted from two earlier Supreme Court decisions, *United States v. McGowan,* 302 U.S. 535, 58 S.Ct. 286, 82 L.Ed. 410 (1938) and *United States v. Sandoval,* 231 U.S. 28, 34 S.Ct. 1, 58 L.Ed. 107 (1913). These cases held that Indian country includes tribal Indian communities under federal protection that did not originate in either a federal or tribal act of *reserving,* or were not specifically designated a reservation. At the same time, it is apparent that Indian reservations and dependent Indian communities are not two distinct definitions of place, but definitions which largely overlap. *See United States v. McGowan,* 302 U.S. at 538–39, 58 S.Ct. at 287–288; *see also* F. COHEN, HANDBOOK OF FEDERAL INDIAN LAW 38 (1982). Nevertheless, the appropriate test to determine whether a community is within the definition of Indian country under Section 1151 is not how the land was acquired, but whether the land has been *set apart* for use and occupancy of Indians. *United States v. McGowan,* 302 U.S. at 539, 58 S.Ct. at 288; *United States v. Mound,* 477 F.Supp. 156 (D.S.D.1979); *Youngbear v. Brewer,* 415 F.Supp. 807 (D.N.D.Iowa 1976), *aff'd,* 549 F.2d 74 (8th Cir.1977); *State v. Youngbear,* 229 N.W.2d 728 (Iowa 1975); *cf. United States v. Sandoval,* 231 U.S. at 40, 34 S.Ct. at 3 (noting that Congress reserved public lands for Indian use and occupancy); *accord United States v. Martine,* 442 F.2d 1022

(10th Cir.1971) (endorsing ·*Sandoval* approach).

Other important factors were outlined in *Martine* to include: 1) the area in question; 2) the relationship of the inhabitants of the area to Indian tribes and to the federal government; and 3) the established practice of the government agencies toward the area. *Id.* at 1023. Additionally, in *United States v. Morgan,* 614 F.2d 166 (8th Cir. 1980), a relevant factor was "cohesiveness" manifested either by economic pursuits in the area, common interests, or needs of the inhabitants as supplied by that locality. *Id.* at 170. The crucial consideration, however, is whether the community or land has been *set apart* for use, occupancy and protection of dependent Indian peoples. *United States v. Mound,* 477 F.Supp. at 160. This crucial factor is nothing more than an expanded concept of the original definition of a dependent Indian community set forth in *McGowan* as a community in which the United States retained "title to the lands which it permits the Indians to occupy" and "authority to enact regulations and protective laws respecting [the] territory." *Id.* 302 U.S. at 539, 58 S.Ct. at 288.

Blatchford contends that Yah-Ta-Hey, although presently situated two miles outside the original boundaries of the Navajo Indian Reservation, was annexed to the reservation as a result of President Woodrow Wilson's Executive Order of 1917, which "set apart for the use and occupancy of the Navajo" and other Indians certain federal lands. *Executive Order No. 2513 of January 15, 1917.* He argues that aboriginal Indian title to the Yah-Ta-Hey area was never extinguished after the United States sold the land in 1866 to the Atlantic & Pacific Railroad Company and pledged to extinguish Indian title "as rapidly as may be consistent with public policy and the welfare of the Indians." Act of July 27, 1866, ch. 278, § 2, 14 Stat. 292 at 294. In addition, he argues that Indian title was not automatically extinguished in 1872, when the railroad line was definitely located. In short, Blatchford argues that the 1917 Order set the Yah-Ta-Hey area apart within the meaning of the test set forth in *McGow-*

*an* and its progeny, because aboriginal title to the area was never effectively extinguished. We disagree.

■ At the outset, we find error in the district court's finding that the 1917 Order encompassed the Yah-Ta-Hey area. The record shows that Yah-Ta-Hey is situated in Section 7 of Township 16 North, Range 18 West. We note that the 1917 Order embraced only three partial sections of Township 16 North, Range 18 West. *Landy v. Federal Deposit Insurance Corporation,* 486 F.2d 139, 151 (3rd Cir.1973), *cert. denied,* 416 U.S. 960, 94 S.Ct. 1979, 40 L.Ed.2d 312 (1974) (noting that an appellate court can properly take judicial notice of any matter of which any court of original jurisdiction may properly take notice); *see also Varcoe v. Lee,* 180 Cal. 338, 181 P. 223 (1919). These scattered sections do not embrace or overlap Section 7. Thus, even assuming that aboriginal Indian title had never been extinguished, the 1917 Order did not embrace the Yah-Ta-Hey area so as to set it apart for use and occupancy of the Navajo. Moreover, we find it difficult to conclude that an Executive Order, such as the 1917 Order, could validly set apart *private* fee land, given the well settled principle that the Executive may not act as lawmaker and take private property for public use. *Youngstown Sheet & Tube Co. v. Sawyer,* 343 U.S. 579, 72 S.Ct. 863, 96 L.Ed. 1153 (1952).

■ But even if we assumed, *arguendo,* that the 1917 Order did encompass the Yah-Ta-Hey area, Indian title to the area was nonetheless extinguished. Aboriginal Indian title is a permissive right of occupancy granted by the federal government to the aboriginal possessors of land. *Johnson and Graham's Lessee v. M'Intosh,* 21 U.S. (8 Wheat.) 543, 5 L.Ed. 681 (1823); *accord United States v. Santa Fe Pacific R. Co.,* 314 U.S. 339, 62 S.Ct. 248, 86 L.Ed. 260 (1941); *Beecher v. Wetherby,* 95 U.S. 517, 525, 24 L.Ed. 440 (1877); *Buttz v. Northern Pacific Railroad Co.,* 119 U.S. 55, 66, 7 S.Ct. 100, 104, 30 L.Ed. 330 (1866); *Fellows v. Blacksmith,* 60 U.S. 366, 15 L.Ed. 684

(1856); *United States v. Gemmill*, 535 F.2d 1145 (9th Cir.1976). The right to extinguish original Indian title rests exclusively with Congress irrespective of who holds the underlying fee title in the land. *Oneida Indian Nation v. County of Oneida*, 414 U.S. 661, 667–69, 94 S.Ct. 772, 777–778, 39 L.Ed.2d 73 (1974); *United States v. Santa Fe Pacific R. Co.; United States v. Kabinto*, 456 F.2d 1087 (9th Cir.1972); *Narragansett Tribe, etc. v. So. R.I. Land Devel.*, 418 F.Supp. 798 (D.R.I.1976). However, courts have required a showing of a clear and specific indication of congressional intent to extinguish Indian title. *E.g., United States v. Santa Fe Pacific R. Co.; see Tee-Hit-Ton Indians v. United States*, 348 U.S. 272, 277, 75 S.Ct. 313, 316, 99 L.Ed. 314 (1955); *Buttz v. Northern Pacific Railroad Co., supra; United States v. Pueblo of San Ildefonso*, 206 Ct.Cl. 649, 513 F.2d 1383 (1975).

Blatchford contends that the only possible evidence of any congressional intent to extinguish Indian title to the Yah-Ta-Hey area is the language of the Act of July 27, 1866, ch. 278, Section 2, 14 Stat. 294 (Act of 1866), which states in relevant part:

> The United States shall extinguish, as rapidly as may be consistent with public policy and the welfare of the Indians, and only by their voluntary cession, the Indian title to all lands falling under the operation of this act * * *.

Blatchford argues that the foregoing language, in and of itself, does not necessarily mean that Indian title to the Yah-Ta-Hey area was automatically extinguished in 1872 when the railroad line was definitely located. We agree that the language of the Act of 1866 does not manifest any clear and specific congressional intent to extinguish Indian title to the Yah-Ta-Hey area, but hold that Congress has otherwise acted to extinguish Indian title to the land.

 Although "extinguishment [of Indian title] cannot be lightly implied in view of the avowed solicitude of the Federal Government for the welfare of its Indian wards," *United States v. Santa Fe Pacific R. Co., supra*, 314 U.S. at 354, 62 S.Ct. at 255, when the government clearly intends

to extinguish Indian title the courts will not inquire into the means or propriety of the action:

> Extinguishment of Indian title based on aboriginal possession is of course a different matter. The power of Congress in that regard is supreme. The manner, method and time of such extinguishment raise political, not justiciable issues. [Citation omitted.] As stated by Chief Justice Marshall in *Johnson v. M'Intosh* [citation omitted], "the exclusive right of the United States to extinguish" Indian title has never been doubted. And whether it be done by treaty, by the sword, by purchase, by the exercise of complete dominion adverse to the right of occupancy, or otherwise, its justness is not open to inquiry in the courts. [Citation omitted.]

*Id.* at 347, 62 S.Ct. at 252. The relevant question, therefore, is whether there was any governmental action intended as a revocation of Indian occupancy rights.

Although the Navajos in 1867 were brought back from Bosque Redondo to an area that includes northwest New Mexico, the "tribe's traditional and historic hunting grounds, pasture, residency and occupancy," the Navajos were a conquered nation, forcibly removed "by sword" from their lands. *See, e.g.,* I COAN, A HISTORY OF NEW MEXICO, at 126–27 (1925). In 1868, a treaty was entered into by and between the United States and the Navajos to establish a reservation for the Navajos. Treaty with the Navajo Indians, June 1, 1868, United States-Navajos, 15 Stat. 667. Article IX of that treaty stipulated:

> [The Navajos] will relinquish all right to occupy any territory outside their reservation, as herein defined, but retain the right to hunt on any unoccupied lands contiguous to their reservation.

*Id.* at 670. By Article XIII of the Treaty, the Navajos agreed to "make the reservation * * * their permanent home," and not to "make any permanent settlement elsewhere, * * * " *Id.* at 671.

 From the foregoing treaty provisions, it is clear that Indian title to the

Yah-Ta-Hey area, and other areas surrounding the reservation, was extinguished as pledged by Congress in the Act of 1866. *Accord United States v. Santa Fe Pacific R. Co.* (Requesting and accepting a new reservation tantamount to an extinguishment by "voluntary cession" within the meaning of same Act); *Buttz v. Northern Pacific Railroad Co.* (Indian title extinguished because, among other things, the Indians "retired" from the occupancy of the lands outside the reservation to the reservation set apart for them by treaty). Further, the military action of the government in forcibly removing the Indians to and from Bosque Redondo prior to signing the treaty is a strong indication of the sovereign's intent to revoke the Navajo rights of permissive occupancy in and around the area in question. *See United States v. Santa Fe Pacific Railroad Co.; see also United States v. Gemmill.*

From the foregoing, we conclude that Yah-Ta-Hey is not a valid extension of the 1868 Navajo Indian Reservation, and as such has not been validly set apart for the use and occupancy of the Navajo and other Indians within the meaning of *McGowan* and its progeny. Such a conclusion is a significant factor in determining that Yah-Ta-Hey is not a dependent Indian community. *United States v. Mound,* 477 F.Supp. at 160. Hence, the crime did not occur in Indian country.

## III.

Had the crime been committed in Indian country, we would have been required to hold that the original state court lacked jurisdiction to try and convict Blatchford, as the State of New Mexico has not accepted jurisdiction of such lands under Public Law 280 or any other federal statute. On its face, NMSA 1978, Section 31–10–3 seems to indicate a conflict on this issue which we discuss.

Congress enacted the Act of August 15, 1953, Public Law 280, 67 Stat. 588 (1953) (codified as amended at 18 U.S.C. § 1162, 28 U.S.C. § 1360), which delegated to six states jurisdiction over most crimes and many civil matters arising on Indian coun-

try within their borders. New Mexico was not among these six states. Nevertheless, Section 6 of the original Act gave the consent of the United States to any state to amend "where necessary" its state constitution *or* statutes to remove "any legal impediment" to the assumption of jurisdiction under the Act. The basis for this section was that the eleven states admitted to the Union after 1889 were required to disclaim jurisdiction over Indian lands as a condition of their admission. *See Dick v. United States,* 208 U.S. 340, 28 S.Ct. 399, 52 L.Ed. 520 (1908); *see also* F. COHEN, *supra,* at 368. This section, of course, applied to New Mexico, and as a result, New Mexico inserted such a disclaimer in its constitution. N.M. Const. art. 21, sec. 2.

In light of the fact that several other "disclaimer" states have acted legislatively to accept some jurisdiction under Public Law 280 without an amendment to their state constitutions (these states include Arizona, Idaho, Montana, North Dakota, South Dakota, Utah, and Washington), the question arises whether New Mexico has accepted jurisdiction under the Act pursuant to Section 31–10–3, which states:

> All Indians, committing against the person or property of *another Indian,* or other person, any of the following crimes, namely: murder, manslaughter, *criminal sexual penetration,* assault with intent to kill, arson, burglary and larceny, within the state of New Mexico and either within or without an Indian reservation, *shall be subject therefor to the laws of this state relating to such crimes, and shall be tried therefor in the same courts* and in the same manner, and shall be subject to the same penalties as are all persons charged with the commission of such crimes, respectively, *and the courts are hereby given jurisdiction in all such cases.* [Emphasis added.]

██ The language of the statute clearly purports to grant jurisdiction to the state courts for crimes over which the federal courts would otherwise have exclusive jurisdiction. *See* 18 U.S.C. § 1153 (1976). Section 31–10–3 was, however, originally en-

acted in 1889, and has incurred very little change through subsequent codification and compilation. Hence, it can hardly be said that Section 31–10–3 was enacted in response to the invitation of Public Law 280, permitting the State to assume either criminal or civil jurisdiction over Indians in Indian country. Neither has there been any other federal jurisdictional grant of authority. As we stated in *Chino v. Chino,* 90 N.M. 203, 561 P.2d 476 (1977):

> [T]he New Mexico Enabling Act * * * disclaimed jurisdiction over the Indians. The State of New Mexico has declined to assume jurisdiction over the Indian reservations within the state by failing to take affirmative steps under Public Law 280, enacted by Congress in 1953, or under more recent congressional acts.

*Id.* at 206, 561 P.2d 476 [footnotes omitted]. *See Your Food Stores, Inc. (NSL) v. Village of Espanola,* 68 N.M. 327, 361 P.2d 950 (1961).

■ However, because we have concluded that the crime did not occur in Indian country, we hold that Blatchford was properly tried and convicted in the original state court below. Accordingly, we reverse the district court's order granting Blatchford's writ of habeas corpus.

Reversed and remanded.

IT IS SO ORDERED.

RIORDAN and STOWERS, JJ., concur.