2001–NMCA–026

24 P.3d 338

**STATE of New Mexico, Plaintiff–Appellee,**

v.

**Travis FRANK, Defendant–Appellant.**

No. 20,376.

Court of Appeals of New Mexico.

March 28, 2001.

Patricia A. Madrid, Attorney General, Ralph E. Trujillo, Ass't Attorney General, Santa Fe, NM, for Appellee.

Phyllis H. Subin, Chief Public Defender, Laurel A. Knowles, Ass't Appellate Defender, Santa Fe, NM, for Appellant.

## OPINION

PICKARD, Judge.

{1} This case requires us to review and clarify the current case law interpreting the definition of "dependent Indian community" contained in 18 U.S.C. § 1151(b) (1994), for the purpose of determining whether the State has jurisdiction over this Navajo Defendant. The United States Court of Appeals for the Tenth Circuit established a two-step analysis to determine what constitutes a "dependent Indian community." *See Pittsburg & Midway Coal Mining Co. v. Watchman,* 52 F.3d 1531 (10th Cir.1995). We adopted that analysis in a prior opinion in this case. *See State v. Frank,* 1997–NMCA–093, ¶ 2, 123 N.M. 734, 945 P.2d 464. However, that analysis was recently called into question when the United States Supreme Court interpreted the meaning of 18 U.S.C. § 1151(b) for the first time since its inception

and established a somewhat different test to determine jurisdiction in what is argued to be Indian country. *See Alaska v. Native Village of Venetie Tribal Gov't,* 522 U.S. 520, 118 S.Ct. 948, 140 L.Ed.2d 30 (1998) (hereinafter *Venetie* ).

{2} Since that time, the Tenth Circuit has twice interpreted the *Venetie* analysis, first in *United States v. Roberts,* 185 F.3d 1125 (10th Cir.1999), and then in *HRI, Inc. v. Environmental Protection Agency,* 198 F.3d 1224, 1248 (10th Cir.2000). We now adopt the Tenth Circuit's analysis of the threshold issue of defining the appropriate "community of reference" as established in *Watchman,* adopted in *Frank,* and reiterated in *HRI.* We then require application of the United States Supreme Court's two-factor test for determining the meaning of "dependent Indian community" established in *Venetie,* which modifies the second step of the *Watchman* analysis. We hold that the district court, in failing to analyze the community of reference issue, applied incorrect criteria in determining jurisdiction in this case. We reverse and remand for additional findings of fact and conclusions of law consistent with this decision.

## ISSUES

{3} Defendant makes three claims on appeal: (1) the district court did not follow the mandate of this Court in the first appeal of the case because it did not use the two-step analysis ordered in *Frank;* (2) the district court's findings of fact are insufficient for it to have analyzed the jurisdiction issue under *Venetie* as applied in the Tenth Circuit; and (3) the area in question is a "dependent Indian community" as defined by 18 U.S.C. § 1151, as a matter of law.

## FACTS AND PROCEDURAL HISTORY

{4} Defendant appeals his convictions of six counts of vehicular homicide stemming from an accident that occurred on Highway 44, a state road that traverses northwestern New Mexico. The following facts are uncontested. Highway 44 runs through an area known as the checkerboard, so-called because of its pattern of land owned or administered by the federal government, the Navajo Nation, Navajo allottees, the state, and private non-Indians. The accident occurred

on land owned by the federal government and administered by the Bureau of Land Management (BLM). Though the situs of the accident is not within the boundaries of the Navajo Reservation, it is within a political subdivision of the Navajo Nation known as the Nageezi Chapter. Defendant, a registered member of the Navajo Nation, moved for the charges to be dismissed for lack of state court jurisdiction, arguing that the area in question was a dependent Indian community as defined by 18 U.S.C. § 1151(b). The district court denied his motion. Defendant then pleaded guilty to the charges, pursuant to *North Carolina v. Alford*, 400 U.S. 25, 91 S.Ct. 160, 27 L.Ed.2d 162 (1970), and reserved his right to appeal on the jurisdiction issue. On appeal, this Court held that the district court applied incorrect criteria in determining whether the accident occurred in Indian country as defined in 18 U.S.C. § 1151(b). *See Frank*, 123 N.M. 734, 945 P.2d 464, 1997–NMCA–093, ¶ 2. We remanded the case to the district court for additional findings and conclusions and instructed it to apply the two-step analysis set out in *Watchman*. *See id.* On remand, the district court again made findings of fact and conclusions of law, determining that the area in question is not a dependent Indian community under 18 U.S.C. § 1151(b). Defendant now appeals from this second district court decision.

## DISCUSSION

### Issue One: The Mandate of This Court on Remand.

■ {5} Defendant is correct in arguing that the general rule is that the lower court's duty on remand is to comply with the mandate of the appellate court and to follow the order without variation. *See Vinton Eppsco Inc. v. Showe Homes, Inc.*, 97 N.M. 225, 226, 638 P.2d 1070, 1071 (1981). However, the general rule does not apply in this case because new law was announced in the interval between our remand and the district court's re-hearing of the case. *See Venetie*, 522 U.S. at 527, 118 S.Ct. 948 (noting that this decision was the first occasion for the Supreme Court to interpret the term "dependent Indian communities" since 18 U.S.C. § 1151(b) was enacted in 1948, rejecting the six-factor test established by the Ninth Circuit, and

establishing a new two-factor test to determine what constitutes a dependent Indian community under 18 U.S.C. § 1151(b)). Defendant does not cite any authority that discusses a lower court's mandate in the event of intervening new law, so we need not address Defendant's direct claims. *See Fernandez v. Farmers Ins. Co.*, 115 N.M. 622, 627, 857 P.2d 22, 27 (1993) (stating the general rule is that cases are not authority for propositions not considered).

■ {6} Here, the district court did not follow our mandate because it concluded that the United States Supreme Court's decision in *Venetie*, announced subsequent to the remand, superseded previous law. The district court is correct, because the Supreme Court has held that when it applies a rule of federal law to the parties before it, it is a controlling interpretation of federal law and must be given full retroactive effect in all cases still open on review, even if the events predated the announcement of the rule. *See Harper v. Virginia Dep't of Taxation*, 509 U.S. 86, 96, 113 S.Ct. 2510, 125 L.Ed.2d 74 (1993); *see also State v. Dick*, 1999–NMCA–062, ¶¶ 13–14, 127 N.M. 382, 981 P.2d 796 (applying *Venetie* analysis on appeal of case in which trial court used *Watchman* analysis); *cf. Clark v. Tansy* 118 N.M. 486, 491, 882 P.2d 527, 532 (1994) (holding that when a habeas petitioner in a criminal case can show that there has been an intervening change of law, relitigation of an issue decided adversely on direct appeal is not barred). However, "[i]n applying federal law, [the Court of Appeals] follow[s] the precedent established by the federal courts, particularly the United States Court of Appeals for the Tenth Circuit." *State v. Snyder*, 1998–NMCA–166, ¶ 9, 126 N.M. 168, 967 P.2d 843. The Tenth Circuit has twice discussed the Supreme Court's decision in *Venetie*, interpreting the Supreme Court's analysis in relation to Indian country in the southwest. Before we can discuss Defendant's remaining issues, we must first consider how to apply the Supreme Court's and Tenth Circuit's decisions to this case.

### Background

{7} 18 U.S.C. § 1151 provides:

"Indian country", as used in this chapter, means (a) all land within the limits of any Indian reservation under the jurisdiction of the United States Government, notwithstanding the issuance of any patent, and, including rights-of-way running through the reservation, (b) all dependent Indian communities within the borders of the United States whether within the original or subsequently acquired territory thereof, and whether within or without the limits of a state, and (c) all Indian allotments, the Indian titles to which have not been extinguished, including rights-of-way running through the same.

{8} In its interpretation of this statute prior to *Venetie*, the Tenth Circuit's analysis was a two-step analysis. *See Watchman*, 52 F.3d at 1543. The first step was to determine the appropriate "community of reference." *Id.* at 1542. In so doing, the "[t]he two guiding principles are: (1) the status of the area in question as a community and (2) consideration of that locale or community of reference within the context of the surrounding area." *Frank*, 123 N.M. 734, 945 P.2d 464, 1997–NMCA–093, ¶ 9 (internal quotations and citations omitted). The second step was a four-factor test to determine whether the land in question is a dependent Indian community within the meaning of 18 U.S.C. § 1151:

"(1) whether the United States has retained 'title to the lands which it permits the Indians to occupy' and 'authority to enact regulations and protective laws respecting this territory,'; (2) 'the nature of the area in question, the relationship of the inhabitants in the area to Indian tribes and to the federal government, and the established practice of government agencies toward the area,'; (3) whether there is 'an element of cohesiveness ... manifested either by economic pursuits in the area, common interests, or needs of the inhabitants as supplied by that locality,'; and (4) 'whether such lands have been set apart for the use, occupancy and protection of dependent Indian peoples.'"

*Watchman*, 52 F.3d at 1545 (quoting *United States v. South Dakota*, 665 F.2d 837, 839 (8th Cir.1981)).

{9} In *Venetie*, the Supreme Court held that an Alaska Native village occupying former reservation land was not a dependent Indian community because the Alaska Native Claims Settlement Act effectively removed federal supervision of all Native lands in Alaska. *See Venetie*, 522 U.S. at 533. The Court also held that the term "dependent Indian communities" referred to a "limited category of Indian lands that are neither reservations nor allotments, and that satisfy two requirements-first, they must have been set aside by the Federal Government for the use of the Indians as Indian land; second, they must be under federal superintendence." *Id.* at 527, 118 S.Ct. 948.

{10} The Tenth Circuit has distinguished its decisions from *Venetie* both times it has addressed the question. The Tenth Circuit first addressed *Venetie* as it related to the Choctaw Nation's disputed land in Oklahoma. *See Roberts*, 185 F.3d at 1132. In *Roberts*, the court conceded that under *Venetie*, the relationship between informal reservations and dependent Indian communities is no longer entirely clear, but concluded that dependent Indian communities, whether formal reservations or not, continue to exist under 18 U.S.C. § 1151 and under United States Supreme Court jurisprudence. *See id.* at 1133. The Tenth Circuit addressed the issue the second time as it related to New Mexico's checkerboard area in a decision announced in January 2000. *See HRI*, 198 F.3d at 1231–32.

■ {11} The *HRI* court concluded that nothing in *Venetie* speaks to the first step of its *Watchman* test, that of determining a proper community of reference prior to determining whether the area in question is a dependent Indian community under 18 U.S.C. § 1151. *See HRI*, 198 F.3d at 1248–49. The court noted that the United States Supreme Court did not address the need to define a proper community of reference because of the categorical effect of the Alaska Native Claims Settlement Act on virtually all Alaskan native lands. *See id.* at 1249. Specifically, the Tenth Circuit court stated, "[b]ecause *Venetie* does not speak directly to the issue, barring en banc review by th[e] court, *Watchman* ... continues to require a

'community of reference' analysis prior to determining whether land qualifies as a dependent Indian community under the set-aside and supervision requirements of 18 U.S.C. § 1151(b)." *HRI*, 198 F.3d at 1249. Therefore a district court, as the first step in its analysis, is to determine the proper community of reference as required by *Watchman* and as discussed in detail in our first opinion, noting that this analysis must require a broader view than just the accident site. *See Frank*, 123 N.M. 734, 945 P.2d 464, 1997–NMCA–093, ¶ 8.

{12} The Tenth Circuit acknowledged that the second step of its *Watchman* test may require "some modification" because of *Venetie*. *See HRI*, 198 F.3d at 1248. It also recognized that the impact of *Venetie* on the *Watchman* analysis would raise potentially difficult questions. *See id.* at 1254. But the *HRI* court did not reach the second step of the analysis in its *HRI* decision. The court did presume that *Venetie* would reduce the weight afforded to two of the four factors of the second step in the *Watchman* analysis, but did not discuss what "modification" might be needed. However, the *HRI* court did use the two-part *Venetie* analysis in determining whether one parcel of the land in question qualified as Indian country under 18 U.S.C. § 1151(a). *See id.* at 1250–54.

### Analysis of the *Venetie* test.

■ {13} Factor one: in determining whether land has been set aside by the federal government for use as Indian land, the Tenth Circuit stated that "land purchased under congressional appropriation of funds for the purpose of 'procuring home and farm sites, with adequate water rights' and '[f]or the purchase of land and water rights' for Indians was validly set aside for the purposes of the Indian country determination." *Id.* at 1251 (quoting *United States v. McGowan*, 302 U.S. 535, 537–39 & n. 4, 58 S.Ct. 286, 82 L.Ed. 410 (1938)). Indian country status does not need a formal designation of reservation, but can merely be lands which Congress intended to reserve for a tribe and over which Congress intended primary jurisdiction to rest in federal and tribal govern-

ments, such as trust lands and allotted lands. *See HRI*, 198 F.3d at 1251.

{14} Factor two: in determining whether the land is under the superintendence of the federal government, the *HRI* court determined several ways that land could be considered to be under federal supervision for the purpose of establishing dependent Indian communities: (1) land supervised by the Bureau of Indian Affairs, (2) land where the United States retains title or oversees the property, and (3) land that is under the jurisdiction and control of Congress. *See id.* at 1253; *see also Dick*, 1999–NMCA–062, ¶ 14 (noting that congressional enactment is an express set-aside of land that ensures that the land is occupied by an Indian community). Of note, however, is the *Venetie* Court's finding that government social programs alone are not indicia of active federal control. *See Venetie*, 522 U.S. at 534, 118 S.Ct. 948. The *Venetie* Court calls for the government to have active control of the lands in question, "effectively acting as a guardian for the Indians." *Id.* at 533, 118 S.Ct. 948.

### Issue Two: Insufficient Facts to Use *Venetie* as Applied by the Tenth Circuit.

■ {15} The district court concluded that *Venetie* obviated the need to use the analysis set out in *Frank*. However, as we have noted, a community of reference analysis must be undertaken as a first step to determine what is the land in question prior to applying the *Venetie* factors to that land. In its decision, contrary to the statement in the dissent that the district court did not "focus myopically on just the site of the actual automobile collision," the district court continually and exclusively referred to the "area in question," the "surrounding land," the "collision site," the "crash site," the "area in which the crash occurred," and "the land immediately surrounding the collision site." There is no suggestion that the district court considered an area larger than the immediate accident site, much less "looked toward the horizon where essentially [it] saw nothing," or that it analyzed a community of reference when determining that the state had jurisdiction to prosecute Defendant. A broader view of the community of reference

is required. *See Frank,* 123 N.M. 734, 945 P.2d 464, 1997–NMCA–093, ¶ 8; *see also Dick,* 1999–NMCA–062, ¶¶ 14–15 (analyzing the 13,150 acres of Fort Wingate as a community of reference to determine if place where Defendant was arrested was dependent Indian community); *United States v. Adair,* 111 F.3d 770 (10th Cir.1997) (analyzing the six to twelve square miles surrounding the Rocky Mountain School to determine if the situs of the offense occurred in dependent Indian community); *HRI,* 198 F.3d 1224 (considering the entire parcel of 200 acres in determining jurisdiction over the site of the Churchrock mine). The district court, as a threshold inquiry, must look for an appropriate community of reference before it applies the *Venetie* factors. The district court must discern an appropriate area for its community of reference inquiry according to the evidence presented in both hearings.

{16} The purpose of locating an appropriate community of reference before undertaking the *Venetie* analysis is to identify the land at issue and, in doing so, attempt to identify the community, if any, most affected by an action. If the community is a "dependent Indian community," then we owe due deference to tribal sovereignty and jurisdiction. *See State v. Ortiz,* 105 N.M. 308, 310, 731 P.2d 1352, 1354 (Ct.App.1986). While we agree with the dissent that the State has a legitimate interest in prosecuting crimes committed within its borders, we also recognize that tribes have an similar interest in sovereignty and self-government. *See Watchman,* 52 F.3d at 1536. "Jurisdictional status of land implicates not only ownership, but also the core sovereignty interests of Indian tribes and the federal government in exercising civil and criminal authority over tribal territory." *HRI,* 198 F.3d at 1245–46. It is these core sovereignty interests that are glossed over by the dissent.

{17} Although the Navajo Nation would lack jurisdiction to prosecute Defendant for manslaughter under the federal Major Crimes Act as the dissent points out, the tribe may potentially wish to exercise jurisdiction over other offenses, such as the DWI at issue in *Dick. See Dick,* 1999–NMCA–062, ¶ 2. As the jurisdictional analysis applies equally to major crimes prosecuted by the federal government and minor crimes that the tribe may wish to handle on a local level in their tribal courts with tribal services, the determination of an appropriate community of reference is not a "sociological expedition," but is an attempt to identify the real interests at stake and to determine jurisdictional issues with a degree of flexibility that gives due respect to state, federal, and tribal interests.

{18} We also note that *Ortiz,* a case relied on by the dissent, is not contrary to our holding. In *Ortiz,* the State was attempting to expand its jurisdiction to include crimes committed within the exterior boundaries of the San Juan Pueblo. *See* 105 N.M. at 309, 731 P.2d at 1353. The State argued that land designated to the Pueblo was distinguishable from land designated as a reservation, such that 18 U.S.C. § 1151(a), which defines "Indian country" to include "all land within the limits of any Indian reservation," did not apply. *See id.* at 311, 731 P.2d at 1355. The Court rejected this argument, holding that the two were indistinguishable. *See id.* at 312, 731 P.2d at 1356. The quotation cited by the dissent is not critical of the "community of reference" analysis per se, but recognizes that in the context of established Pueblo boundaries, such analysis is both unnecessary and undesirable. *See id.* In the case at bar, however, there are no clear boundaries, and it is the land itself that is checkerboard. It is therefore necessary for the district court to discern an appropriate area in which to evaluate jurisdiction.

**Issue Three: Dependent Indian Community as a Matter of Law.**

{19} Defendant argues that the facts presented below establish as a matter of law that the Nageezi Chapter or a portion thereof is a dependent Indian community as defined by 18 U.S.C. § 1151(b) using the *Watchman, HRI,* or *Venetie* tests. Because determination of a dependent Indian community turns on specific findings of fact unique to this case, and because there are conflicting facts or facts susceptible to conflicting inferences regarding the determinations of the proper community of reference, we cannot

say, as a matter of law, that the Nageezi Chapter is a dependent Indian community.

### Evidence of Community of Reference.

{20} The United States Supreme Court has refused to precisely define "community," recognizing that challenges to vagueness in the statute must be examined in light of the facts of the case at hand. *See United States v. Mazurie*, 419 U.S. 544, 549–50, 95 S.Ct. 710, 42 L.Ed.2d 706 (1975). Defendant argued in the first hearing that the entire Nageezi Chapter was the appropriate community of reference. In the second hearing, he argued that a representative portion of a five-by-five mile area around the accident site is the appropriate community of reference. In his brief in chief, he argues that even a five-mile radius around the accident site is an appropriate area to analyze as a community of reference because it meets all the criteria described in *Frank* to determine community. *See Frank*, 123 N.M. 734, 945 P.2d 464, 1997–NMCA–093, ¶¶ 9–11. Defendant asked the court in the second hearing to consider that the people who inhabit Nageezi make it a community, even though the land is a checkerboard area. Defendant notes that the Nageezi Chapter has a strong element of cohesiveness because inhabitants share a common membership in the chapter and share common economic pursuits. Within a five-mile radius of the accident site, there is a traditional Navajo church, a BIA school, a post office, a gas station, and a trading post that offers basic necessities. The Nageezi Chapter itself is made up of approximately 40 percent Indian land. The land is part of the traditional Navajo homeland. Defendant admitted at the second hearing that he had no demographic data, but according to the undisputed testimony of a Nageezi landlord at the first hearing, the entire Nageezi chapter is inhabited exclusively by Navajos, with the exception of the Anglo owners of the Nageezi and Blanco trading posts. The trading post owners trade almost exclusively with Navajos. Most BLM grazing permits are passed down through Navajo families. The Nageezi Chapter provides business and housing services to members, and the Chapter House hosts social gatherings and clan meetings. There is tribal housing consisting of 15–20 homes to the west of the accident site and six homes located two miles north of the accident site. Nageezi contracts with Jemez Electric for power in the area. The volunteer firefighters are funded by the county, but are all Navajo. Though Navajo Department of Public Safety officers do not usually patrol Highway 44, they will take Navajo drivers who commit misdemeanors to tribal court. The district court must determine whether or not this or other evidence is sufficient to constitute a meaningful community of reference. *See Frank*, 123 N.M. 734, 945 P.2d 464, 1997–NMCA–093, ¶¶ 10–11.

{21} At the second hearing, the State suggested that the community of reference should properly be Farmington, Aztec, and Bloomfield, since they are the closest places that provide comprehensive services such as shopping and health care. However, the community of reference must necessarily contain the situs of the offense, so we reject those communities for this analysis. In its answer brief, the State suggests that the two-mile radius around the accident site is an appropriate community of reference. The State presented evidence showing that the two-mile area is essentially vacant land administered by the BLM and used only for grazing purposes. Since no one can legally live on BLM land, it cannot be a community. On one side of the highway at the accident site is a grazing permit held by a Navajo, but the grazing permit on the other side is held by an Anglo. In addition, the State presented evidence that the San Juan County Sheriff's Department patrols Highway 44 and does not cite Navajo traffic offenders to tribal court. It presented evidence that firefighting services are funded by the state or the county and supervised by the San Juan County Fire Marshall, emergency medical services are provided by San Juan Region EMS and not by Indian Health Services, and Bloomfield Public Schools serves the area and many residents choose to bus their children to Bloomfield. The State also presented evidence that the Navajo Nation does not provide a school at Nageezi and the BIA school accepts Native American children from outside Nageezi, that the Navajo Department of Public Safety officer who was

first on the scene declined to accept jurisdiction over the scene or the ensuing investigation and criminal charges, and Navajo officers do not handle criminal investigations on Highway 44. At the hearing, the State also noted that members of the Nageezi Chapter can live anywhere and still be members of the Chapter. The district court must determine whether or not this or other evidence is sufficient to determine that there is not a meaningful community of reference surrounding the accident site. *See Frank*, 123 N.M. 734, 945 P.2d 464, 1997–NMCA–093, ¶¶ 10–11.

{22} The district court may conclude, as the *Adair* Court did, that there is no appropriate community of reference in which the accident occurred. The foregoing facts would support such a conclusion. If, after analyzing the relevant community the court finds no community of reference, then the analysis ends and the *Venetie* test need not be undertaken. *See Frank*, 123 N.M. 734, 945 P.2d 464, 1997–NMCA–093, ¶ 9. If an appropriate community of reference emerges from any of the facts presented, the district court must then analyze that community using the two *Venetie* factors as described in this decision.

**Application of *Venetie*.**

{23} In applying the *Venetie* factors discussed above to the appropriate community of reference, the district court must first consider whether significant portions of that community were set aside for the use of Indians as Indian trust land or allotments. *See HRI*, 198 F.3d at 1251. We note that the presence of non-Indian owned land does not necessarily mean that the area is not Indian country for the purposes of the statute. *See State v. Ortiz*, 105 N.M. 308, 312, 731 P.2d 1352, 1356 (Ct.App.1986) (finding that land outside of the exterior boundaries of a pueblo constituted Indian land for the purposes of 18 U.S.C. § 1153 (1994)); *see also Dick*, 1999–NMCA–062, ¶ 25 (indicating that privately held land can constitute "Indian country" when it is within the boundaries of land that is properly considered "Indian country"). In applying the second factor, the district court must consider whether significant portions of the land constituting the community of reference are owned and supervised by the Bureau of Indian Affairs or the United States government and are under active federal control. *See HRI*, 198 F.3d at 1253. This is a factual inquiry that is necessarily dependant on the court's first-step conclusions regarding an appropriate community of reference. Analysis of the *Venetie* factors in relation to the community of reference are also subject to conflicting facts and facts susceptible to conflicting inferences as discussed above. The district court could find that the appropriate community of reference does or does not meet the *Venetie* factor requirements.

## CONCLUSION

{24} We reverse and remand to the district court to make particularized findings of fact and conclusions of law consistent with this opinion. The district court may, but is not required to, hold a hearing, and it may, but is not required to, take further written submissions.

{25} **IT IS SO ORDERED.**

M. CHRISTINA ARMIJO, Judge, concurs.

RICHARD C. BOSSON, Chief Judge, dissents.

BOSSON, Chief Judge (dissenting).

{26} I respectfully dissent. I agree with the majority that the trial court applied the appropriate standard on remand in light of the United States Supreme Court's intervening opinion in *Alaska v. Native Village of Venetie Tribal Gov't*, 522 U.S. 520, 118 S.Ct. 948, 140 L.Ed.2d 30 (1998). But unlike the majority, I also believe the court correctly interpreted *Venetie*.

{27} I conclude that the trial court properly applied its holding to the facts of this case, and then rightly upheld the state's jurisdiction to prosecute Mr. Frank. In my judgment, the majority opinion portends an undesirable turn in the development of New Mexico law regarding state and tribal jurisdictional conflicts. Because it only adds to the confusion surrounding the state's crimi-

nal jurisdiction to prosecute felonies in a sizeable area of our state, I feel compelled to spell out my differences and suggest a solution.

{28} First, the confusion. After a fair reading of the majority opinion, I am at a loss as to just what it is that Judge Rich is supposed to do and how he is supposed to do it. Some might conclude he is to perform a kind of sociological expedition in search of a "community of reference." It is certain that he is to cast a wide net, expanding far beyond the accident site and the immediately surrounding area. Somehow, the judge is to define that community, not based on objective facts like ownership of land, but by using ambiguous topics to interpret people's lives, their life-styles, their "cohesiveness," their relationship to governments, and their sense of self. In theory such a task might not exceed a judge's grasp; our courts often decide complex matters. But that is not the point. The majority creates a jurisdictional threshold that prosecutors must overcome just to get into court, much less obtain a verdict.

{29} New Mexico has a legitimate, sovereign interest in prosecuting serious felonies committed within its borders and outside tribal lands. The tribes have a similar interest. If state prosecutors and courts must conduct such a fact-intensive investigation even before the state knows whether it has the right to prosecute, the implications are obvious. In the present case that investigation has evolved into a trial within a trial that has now consumed five years and counting. It is but a small step to foresee the day when overburdened, pragmatic state officials will put such crimes to one side in favor of other, more manageable matters. A serious crime like vehicular manslaughter, with its six victims, goes to the heart of the state's law enforcement responsibilities. Yet we make that public duty, and the trust bestowed by the people, all the more elusive when we require the state to shoulder the burdens imposed by this opinion.

{30} Fifteen years ago while on this Court, then-Judge Minzner wrote in a similar context: "While it is not possible in New Mexico to avoid occasional jurisdictional confusion and competition, the result sought by the state would exacerbate the present difficulties. If an extensive factual inquiry [into community] is necessary to make a jurisdictional determination, criminal trials will be delayed.... [W]e would encourage a more extensive pattern of 'checkerboard jurisdiction.' This result is inconsistent with Congressional intent." *State v. Ortiz*, 105 N.M. 308, 312, 731 P.2d 1352, 1356 (Ct.App.1986) (citations omitted). The *Ortiz* court rejected a community-based claim by the state that would have expanded state jurisdiction by circumscribing the definition of Indian country. The same should hold true when a defendant invites us to expand the definition of Indian country by using an ambiguous community-based approach.

{31} New Mexico should be wary of burdening its criminal justice system, unless we are somehow required to do so by virtue of federal statute, judicial decision, or some other expression of sound public policy. After all, anyone generally familiar with Indian law must concede that the state is but one player in a script written largely by others. The majority would persuade us that Mr. Frank's case is just such an instance, but I do not agree.

{32} As separate, sovereign, and independent governmental entities, tribes and states each are entrusted with areas of primary jurisdiction over law enforcement. As neighbors and fellow citizens, tribes and states inevitably overlap to some degree in their jurisdictional claims. Whenever possible, those conflicts should be worked out by the political branches of their respective governments through a process of negotiation based on mutual respect.

{33} As a practical matter, that may be what occurred at the accident site on Highway 44. When the tribal police officer first arrived on the scene, he promptly invited state and local police officers to assume primary responsibility over the investigation; the officer chose not to refer the matter to tribal law enforcement. The trial court also found as a fact in this case that, in this particular area of State Highway 44, state and local police officers traditionally undertake primary law enforcement responsibility,

not the Navajo Nation. I suggest that this kind of ad hoc allocation of jurisdictional responsibilities, a consensual undertaking by knowledgeable people on the ground, should be given more respect and deference than the majority demonstrates in its opinion.

{34} I also note that the Navajo Nation has not sought to intervene or otherwise appear as an interested party in this endless saga. The reason may lie in the federal Major Crimes Act under which the tribe is deprived (unjustly in my view) of jurisdiction to prosecute important felonies like manslaughter in tribal court. Thus, Mr. Frank's crime would be referred, if at all, to the United States Attorney for prosecution in federal court. *See* 18 U.S.C. § 1153 (1994).

{35} The public policy issue presented in this appeal is not the state versus the tribe. Instead, it is just a choice between the state prosecutor or the federal prosecutor, and a state or federal venue. As evidence of the lack of federal interest in assuming jurisdiction, one need only recall that this is the same beleaguered United States Attorney's Office that regularly sluffs off to state district attorneys the job of prosecuting federal drug crimes. And we should be mindful that the provocateur of this conflict is not the tribe, but a skillful defense attorney hoping to avoid prosecution by playing off the jurisdictional aspirations of each against the other. *Cf. United States v. Roberts*, 185 F.3d 1125 (10th Cir.1999) (defendant arguing that the crime did not occur in Indian country and therefore could only be prosecuted in state court). Thus, strictly from a policy point of view, it does not appear to me that legitimate considerations of comity and respectful relations between state and tribe require us to interpose these obstacles in the state's way.

{36} Is it, then, federal law that dictates such a result? Not to my eye. It is true that before the Supreme Court's recent pronouncement in *Venetie*, federal case law from the Tenth Circuit gave birth to the very complex analytical framework cited by the majority. *See Pittsburg & Midway Coal Mining Co. v. Watchman*, 52 F.3d 1531 (10th Cir.1995). The first opinion in *State v. Frank*, 1997–NMCA–093, 123 N.M. 734, 945 P.2d 464, written before *Venetie*, closely followed *Watchman*. I would observe that *Watchman* was not a criminal case; it did not implicate the same competing interests between state and tribe, much less their intensity, that are inherent in matters of criminal justice. Most important, whether or not *Watchman* was an appropriate model for the original *Frank* opinion, *Venetie* has rendered it mostly irrelevant to the criminal case before us.

{37} In its 1998 opinion in *Venetie*, a rare unanimous decision from our nation's highest court, the United States Supreme Court interpreted 18 U.S.C. § 1151(b)for the very first time and put its imprint on the definition of dependent Indian community as never before. Writing as a matter of first impression, the Supreme Court purposely gave a narrow reading to 18 U.S.C. § 1151(b). A dependent Indian community, said the Court, "refers to a limited category of Indian lands that are neither reservations nor allotments and that satisfy two requirements." *Venetie*, 522 U.S. at 527, 118 S.Ct. 948. First, the land in question must have been "set aside" by the federal government "for the use of the Indians as Indian land." *Id.* Second, the land must be under federal superintendence. *See id.*

{38} Note the emphasis on land. To determine jurisdiction, the Supreme Court, not surprisingly, directs our attention to land and its title and away from the more nebulous issue of community cohesiveness. *See id.* at 531–32 n. 7, 118 S.Ct. 948. Jurisdiction is, after all, largely a question of territory. The Supreme Court emphasized that the federal set-aside is essential to "ensure[ ] that the land in question is occupied by an 'Indian community.'" *Id.* at 531, 118 S.Ct. 948. In other words, we look first to the land and its title. If, and only if, it is a federal set-aside for the use of Indians as Indian land, then we proceed to the question of community and federal superintendence. *See id.* at 531 n. 5, 118 S.Ct. 948 ("it is *the land in question*, and not merely the Indian tribe inhabiting it, that must be under the superintendence of the Federal Government."); *but see Yukon Flats Sch. Dist. v. Venetie Tribal Gov't*, 101 F.3d 1286, 1291 n. 1 (9th Cir.1996) (" 'it is not *land* but *Indians* which must be under the super-

intendence of the federal government' ''), *overruled by Alaska,* 522 U.S. 520, 118 S.Ct. 948, 140 L.Ed.2d 30.

{39} We do not, as the present majority opinion implies, go first in search of a community, and then investigate the land. The majority has it backwards. Without a federal set-aside, it does not matter who lives in the area, Indian or non-Indian, because after *Venetie* those inhabitants cannot satisfy the definition of a dependent Indian community without first proving a federal set-aside. This court has only recently stated as much: *Venetie* "shift[s] the emphasis from the inhabitants and their day-to-day relationship with the government to a land-based inquiry." *State v. Dick,* 1999–NMCA–062, ¶ 10, 127 N.M. 382, 981 P.2d 796. Quoting and expressly relying upon similar statements in *Dick,* one federal court recently stated, "What is more, after *Venetie III,* factors other than federal set-aside and superintendence are so diminished in importance as to be practically meaningless, except perhaps to the extent that those other "extremely far removed" factors can be used to inform the analysis of the two federal requirements." *Thompson v. County of Franklin,* 127 F.Supp.2d 145, 154 (N.D.N.Y.2000).

{40} In this case, the accident occurred on a state highway; the surrounding land for a mile or two in any direction is owned by the United States Bureau of Land Management and is grazed under permit by both Indian and non-Indian ranchers. The district court correctly determined that this land, the relevant point of inquiry, was not set aside for the use of Indians as Indian land, and no one disputes this basic issue. That should end the inquiry. Unless there is first a federal set-aside, we do not proceed to analysis of community. The federal set-aside threshold "ensures that the land in question is occupied by an 'Indian community.'" *Venetie,* 522 U.S. at 531, 118 S.Ct. 948.

{41} The majority deals with *Venetie* by relying instead on two recent Tenth Circuit opinions. The first opinion, *Roberts,* 185 F.3d 1125, is unremarkable. Far from distinguishing *Venetie,* the opinion in *Roberts* upheld federal jurisdiction to prosecute criminal activity that took place within the confines of the Choctaw Nation of Oklahoma on land that, although not strictly speaking a reservation, was held by the United States for the benefit of the Choctaws and their tribal members. *Roberts* is nothing more than a traditional application of 18 U.S.C. § 1151. *Id.* at 1129–37. It did not distinguish or depart from *Venetie,* and, if relevant at all to the present dispute, *Roberts* supports what Judge Rich did below.

{42} The second opinion, *HRI, Inc. v. E.P.A.,* 198 F.3d 1224 (10th Cir.2000), is more problematic, because as the majority correctly points out, it continues even after *Venetie* to require a community-based analysis separate from the land title analysis. But *HRI* is not a criminal case; *HRI* is another regulatory decision, a sequel to *Watchman.* In *HRI* a federal law entitled the United States Environmental Protection Agency (EPA) to assume regulatory jurisdiction over water quality affected by proposed mining in Indian country; in case of a dispute over the Indian country status of the land to be affected, EPA could take jurisdiction until the dispute was resolved. *Id.* at 1233. The EPA did not claim that the land in question was conclusively Indian country; it only wanted the opportunity to reach a final decision in light of the new Supreme Court decision in *Venetie.* *See id.* at 1248. Therefore, the question in *HRI* was only whether the land might conceivably, under any theory, fit within the definition of dependent Indian country. The Tenth Circuit held that it was possible and remanded for factual inquiry. *HRI's* unique procedural context renders slender support for the categorical assertions the majority now makes in its name.

{43} Nonetheless, the Tenth Circuit opinion did include troublesome musings. It implied that a mine to be located on 160 acres of private fee land, not tribal land or a federal set-aside in any sense, might be considered (the court did not decide one way or the other) part of a dependent Indian community for federal regulatory purposes. This would occur if the relevant community of reference were considered in the broader context of the local tribal chapter, a political subdivision. *See id.* at 1249. This is the language on which the majority relies so heavily.

{44} Regardless of how such thinking might work for federal regulatory purposes, I believe it is the wrong model for New Mexico to define state jurisdiction to prosecute crimes committed outside tribal boundaries. Much of the checkerboard area of northwestern New Mexico may be regarded, depending on the observer's point of view, as within the overall ambit of a tribal chapter or a similar political subdivision. If that is now to be the limit on state jurisdiction to prosecute, then the majority opinion marks a radical shift from precedent. To my knowledge, no New Mexico appellate case has ever limited a state prosecution unless the crime was in fact committed on land that was either within tribal or pueblo boundaries, or an Indian allotment, or on land that was actually set aside for the benefit of a tribe or pueblo and its members. See Dick, 1999–NMCA–062, ¶¶ 24–27 (holding that the state did not have jurisdiction over crime committed on land held by the Bureau of Indian Affairs for the use and benefit of a discrete Indian community). Additionally, I know of no federal criminal case that agrees with the majority. Nothing requires us to adopt the Tenth Circuit's opinion and make HRI part of the fabric of New Mexico criminal law. In my opinion, we should not do so.

{45} Rather than expanding and complicating the inquiry for the trial court, I submit that Judge Rich got it quite right. He did not, as the majority suggests, focus myopically on just the site of the actual automobile collision. Judge Rich appears to have looked toward the horizon where essentially he saw nothing; just federal BLM land, the title to which most assuredly does not satisfy the threshold set-aside requirement of Venetie. Judge Rich saw no community, dependent or otherwise, and thus, he concluded that the crime did not occur within Indian country as defined by federal statute.

{46} Not only was Judge Rich in step with Venetie; he was following established New Mexico precedent. In Blatchford v. Gonzales, 100 N.M. 333, 335, 670 P.2d 944, 946 (1983), the New Mexico Supreme Court, speaking through Justice Payne and in a context eerily similar to the present appeal, used much the same language to define a dependent Indian community as the United States Supreme Court would do 15 years later in Venetie. Our Supreme Court stated, "The crucial consideration, however, is whether the community or land had been set apart for use, occupancy and protection of dependent Indian peoples. This crucial factor is nothing more than an expanded concept of the original definition of a dependent Indian community ... in which the United States retained 'title to the lands which it permits the Indians to occupy.'" Id. at 336, 670 P.2d at 947 (quoting United States v. McGowan, 302 U.S. 535, 539, 58 S.Ct. 286, 82 L.Ed. 410 (1938)). In Blatchford, the Court upheld the state's authority to prosecute a crime committed within a recognized Navajo community that was located two miles from tribal boundaries. See id. at 339, 670 P.2d at 950. The community, largely populated by Navajo tribal members and most likely within the political purview of a tribal chapter, was not situated on land set aside by the federal government for tribal use. That essentially decided the matter. See Blatchford v. Sullivan, 904 F.2d 542, 548–49 (10th Cir. 1990) (applying similar test to same facts and agreeing with result reached by New Mexico Supreme Court).

{47} Blatchford is still good law in New Mexico. As far as I can tell, it has never been distinguished or limited by our Supreme Court. In my view, Blatchford anticipated Venetie and is part of a legal mosaic which, along with Dick, compels a different result in this case. I believe we should uphold the decision below without yet another remand. The majority holding otherwise, I respectfully dissent.